JANE A. AZZOLINO; LOUIS AZZOLINO; MICHAEL LAWRENCE AZZOLINO, BY HIS GENERAL GUARDIANS, JANE A. AZZOLINO AND LOUIS AZZOLINO; REGINA MARY GALLAGHER, BY HER GENERAL GUARDIAN, JANE A. AZZOLINO; AND DAVID JOHN AZZOLINO, BY HIS GENERAL GUARDIAN, LOUIS AZZOLINO, PLAINTIFFS v. JAMES R. DINGFELDER; JEAN DOWDY; AND ORANGE-CHATHAM COMPREHENSIVE HEALTH SERVICES, INC., D/B/A HAYWOOD-MONCURE COMMUNITY HEALTH CENTER, DEFENDANTS

No. 8315SC1292

(Filed 20 November 1984)

1. **Appeal and Error § 6.2— order not adjudicating all rights of all parties—right of immediate appeal—appeal from final judgment**

Even if the trial court's orders dismissing plaintiff children's claims and leaving plaintiff parents' claims for trial affected a substantial right so that plaintiff children could have immediately appealed pursuant to G.S. 1-277, the children did not lose their right to appeal from the final judgment by choosing not to appeal immediately.

2. **Physicians, Surgeons, and Allied Professions § 11— prenatal care—duty of health care providers—information about genetic risks**

When defendants, a family nurse practitioner and an obstetrician-gynecologist, accepted a pregnant woman as their patient for prenatal care, they had a duty to provide reasonable care for her which also extended to the fetus she was carrying. This duty required defendants to provide the parents of the unborn child with material information about genetic risks so as to enable them to decide whether to terminate the pregnancy.

3. **Physicians, Surgeons, and Allied Professions § 17.1— action for wrongful life—proximate cause**

In an action for wrongful life by a child born with Down's Syndrome, the element of proximate cause was provided by allegations that the parents of the child would have aborted the fetus if they had received adequate advice from defendants about amniocentesis and the availability of genetic counseling and had learned through amniocentesis that the fetus had Down's Syndrome.

4. **Physicians, Surgeons, and Allied Professions § 17.1— action for wrongful life**

A child born with Down's Syndrome could maintain a "wrongful life" action against health care providers based on allegations that defendants negligently failed to inform the child's parents with respect to amniocentesis and the availability of genetic counseling, thereby preventing a parental choice

to avoid the child's birth. The damages recoverable in a wrongful life action are limited to the extraordinary expenses to be incurred during the child's lifetime by reason of his impairment.

**5. Physicians, Surgeons, and Allied Professions § 17.1— no right of action by siblings of "wrongfully born" child**

A cause of action may not be maintained by the minor siblings of a "wrongfully born" child for damages allegedly suffered by them as a result of the wrongful birth under theories of negligence, nuisance per accidens or loss of parental consortium.

**6. Physicians, Surgeons, and Allied Professions § 17.1— action for a wrongful birth**

The parents of a child born with Down's Syndrome have a legally cognizable claim against defendant health care providers for "wrongful birth" of the child based on allegations that defendants negligently failed to advise plaintiffs with respect to amniocentesis and the availability of genetic counseling, and that if they had been properly advised, plaintiffs would have discovered through amniocentesis that the unborn child had Down's Syndrome and would have legally terminated the pregnancy by an abortion. The parents' recovery in a "wrongful birth" action is limited to damages for the mental anguish which they have endured and will continue to endure as a result of the birth of the impaired child.

**7. Physicians, Surgeons, and Allied Professions § 17.1— family nurse practitioner —wrongful birth action—insufficient evidence**

Plaintiffs' evidence in a wrongful birth action was insufficient to show that negligence by defendant family nurse practitioner in her advice concerning amniocentesis was a proximate cause of their damages where it showed that such defendant's advice did not influence plaintiffs in their decision to forego amniocentesis.

**8. Physicians, Surgeons, and Allied Professions § 11.1— standard of care—applicable community**

Although defendant obstetrician-gynecologist provided prenatal care to plaintiff mother at the Haywood-Moncure Community Health Center, the standard by which defendant's action should be judged in a wrongful birth action is that applicable to other obstetricians and gynecologists with similar training and experience practicing in Chapel Hill or a similar community where defendant was a professor at the UNC School of Medicine and on the staff at North Carolina Memorial Hospital, defendant's practice was based primarily in Chapel Hill, and defendant only practiced a half day a week in the Haywood-Moncure community.

**9. Physicians, Surgeons, and Allied Professions § 17.1— wrongful birth action— sufficiency of evidence**

Plaintiffs' evidence was sufficient for the jury in an action against defendant obstetrician-gynecologist for the wrongful birth of their child with Down's Syndrome where it tended to show that defendant provided prenatal care for plaintiff mother; plaintiff mother, who was 36 years old, expressed high con-

Azzolino v. Dingfelder

cern about the risk that the child she was carrying might have Down's Syndrome in that she raised the question of amniocentesis herself and indicated that she had already decided to have the procedure; defendant told the mother not to worry about amniocentesis because that procedure was for women 37 years of age or older; as a result of this advice, plaintiffs decided to forego amniocentesis; the policy in defendant's medical community was to provide genetic counseling and to consider amniocentesis for women 35 and 36 who expressed high concern about Down's Syndrome; plaintiff mother would have had a legal abortion had she learned through amniocentesis that the fetus had Down's Syndrome; plaintiffs' child has severe mental retardation and other physical abnormalities which will require extraordinary medical treatment and continued care for the rest of his life; and plaintiffs have suffered emotional distress resulting from the fact that their child has Down's Syndrome.

**10. Corporations § 27.2; Principal and Agent § 9— liability of corporation for physician's negligence**

The evidence was sufficient to show that defendant physician was subject to interference or control by the corporate defendant with respect to the manner or method of performing his duties at a medical clinic operated by the corporate defendant so that the corporate defendant is liable under the doctrine of *respondeat superior* for the negligence of defendant physician in the performance of his duties at the clinic.

**11. Damages § 12.1; Physicians, Surgeons, and Allied Professions § 21— actions for wrongful life and wrongful birth—punitive damages—insufficiency of complaint**

Plaintiffs' complaint in actions for wrongful life and wrongful birth failed to state a claim for punitive damages where the alleged conduct of defendants which served as the basis for the claim for punitive damages occurred after the child's birth and did not accompany the tortious conduct which caused plaintiffs' injury.

APPEAL by plaintiffs from *Barnette, Judge.* Judgment entered 24 May 1983 in Superior Court, CHATHAM County. Heard in the Court of Appeals 25 September 1984.

On 13 October 1981, plaintiffs initiated this medical malpractice action seeking to recover from the defendants, Dr. James R. Dingfelder, Jean Dowdy, and Orange-Chatham Comprehensive Health Services, Inc., damages arising from the alleged wrongful birth of Michael L. Azzolino, who is the son of plaintiffs Louis and Jane Azzolino and the half-brother of plaintiffs Regina Gallagher and David Azzolino. Michael Azzolino was born on 11 October 1979 afflicted with a permanent genetic disorder known as Down's Syndrome which is characterized by mental retardation and other physical abnormalities.

Jane Azzolino received prenatal care during her pregnancy with Michael at the Haywood-Moncure Community Health Center (hereinafter "the Clinic") which is a health facility in Chatham County operated by Orange-Chatham Comprehensive Health Services, Inc. (hereinafter "OCCHS"). At the Clinic, she was seen both by Jean Dowdy, a registered nurse and family nurse practitioner employed by the Clinic, and Dr. James R. Dingfelder, an obstetrician-gynecologist on the staff at North Carolina Memorial Hospital in Chapel Hill. Through a contractual arrangement between the University of North Carolina and OCCHS, Dr. Dingfelder spent one half day per week at the Clinic where he provided gynecological and obstetrical care for patients and supervised the work of the family nurse practitioners.

In the first cause of action of the complaint, plaintiffs Louis and Jane Azzolino (hereinafter "Mr. and Mrs. Azzolino" or "the plaintiff parents") set forth what we shall refer to as a "wrongful birth claim" wherein they alleged that defendants Jean Dowdy and Dr. Dingfelder were negligent in their prenatal care of Mrs. Azzolino in that they failed to properly advise her with respect to amniocentesis and the availability of genetic counseling; that had Mrs. Azzolino been properly advised, she would have had amniocentesis performed which would have revealed that her fetus had Down's Syndrome; and that had she known her fetus had Down's Syndrome, she would have legally terminated her pregnancy by having an abortion.

In the second cause of action of the complaint, Michael Azzolino through his parents as guardians set forth what we shall refer to as a "wrongful life claim." He alleged that as a direct and proximate result of the defendants' negligence, he was not aborted while still a fetus within his mother's womb, but was instead allowed to be born afflicted with Down's Syndrome thereby damaging him by virtue of his very existence. In the third cause of action, Michael's older half-siblings, Regina and David, alleged that they too have been damaged by their brother's wrongful birth, and that defendants should have reasonably foreseen that Regina and David would be damaged by the birth of a sibling with Down's Syndrome.

Plaintiffs further alleged that defendant OCCHS is liable for the negligence of the individual defendants under the doctrine of

respondeat superior, and that Dr. Dingfelder is liable for the negligence of defendant Jean Dowdy under this same doctrine.

On 11 December 1981, defendants filed motions to dismiss the complaint, pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure on the grounds that the complaint and each of the causes of action stated therein failed to state a claim upon which relief can be granted. On 14 December 1982, the trial court entered orders allowing defendants' motions in part and dismissing Michael's cause of action for wrongful life and the siblings' cause of action. Subsequently, defendants moved for partial summary judgment on the issue of punitive damages which motion was allowed by the court by order entered 6 May 1983.

The only cause of action remaining for trial was the parents' claim for wrongful birth. At the close of plaintiffs' presentation of evidence at trial, defendants moved individually for directed verdicts pursuant to Rule 50 of the North Carolina Rules of Civil Procedure. The court allowed the motions, thereby dismissing the wrongful birth claim. From the judgment entered 24 May 1983 finally terminating the action, plaintiffs appealed.

*Tim Hubbard for plaintiff appellants.*

*Smith, Anderson, Blount, Dorsett, Mitchell and Jernigan, by C. Ernest Simons, Jr. and Steven M. Sartorio, and Coleman, Bernholz, Dickerson, Bernholz, Gledhill and Hargrave, by Roger B. Bernholz, for defendant appellees.*

HILL, Judge.

I

[1] The threshold question we must address is whether the appeals taken by Michael Azzolino and his siblings were timely made. Defendants contend the court's orders of 14 December 1982 dismissing the children's claims constituted a final adjudication of those claims because they were separate and distinct from the claims of the parents; that the court's orders affected a substantial right of the parties; and therefore an appeal from those orders should have been taken within ten days from their entry. Having failed to appeal immediately from the entry of those orders, defendants contend the plaintiff children waived their

rights to appeal and should not now be allowed to challenge the trial court's decision regarding their claims. We disagree.

Although the court's orders of 14 December 1982 may have been final in nature with respect to the children's claims, such orders were not final judgments as defined by Rule 54 of the North Carolina Rules of Civil Procedure because they adjudicated the rights and liabilities of fewer than all the parties and did not contain a determination by the trial court that there was no just reason for delay. *See* G.S. 1A-1, Rule 54(b). Thus, an immediate appeal could only have been taken from the 14 December 1982 orders if they affected a substantial right of the parties. *See* G.S. 1-277; G.S. 1A-1, Rule 54(b).

Assuming arguendo that the 14 December 1982 orders affected a substantial right of the parties, the plaintiff children could have immediately appealed pursuant to G.S. 1-277 if they so desired. However, they were not required to do so. *See Ingle v. Allen,* 71 N.C. App. 20, 321 S.E. 2d 588 (1984); *Lloyd v. Carnation Co.,* 61 N.C. App. 381, 301 S.E. 2d 414 (1983). By choosing not to appeal immediately, plaintiffs may have lost their right to have all their claims tried at one time, but they did not lose their right to appeal from the final judgment. *Id.* We conclude that the plaintiff children adequately preserved their right to appeal from the orders dismissing their claims by noting exceptions to those orders and giving timely notice of appeal after entry of the final judgment in the action.

## II

We turn now to the merits of the appeal before us. This appeal presents several questions of first impression in this state including the following: (1) whether a cause of action for "wrongful life" may be maintained; (2) whether a cause of action for "wrongful birth" may be maintained; and (3) whether a cause of action may be maintained by the minor siblings of a "wrongfully born" child for damages allegedly suffered by them as a result of the wrongful birth. The causes of action which the plaintiffs seek to have recognized were unknown under the common law and have not been provided for by statute in this state; however, it has been argued that they are logically consistent with the traditional tort framework of duty, breach, proximate cause, and damages. *See generally* Note, "Wrongful Life: A Modern Claim Which Con-

forms to the Traditional Tort Framework," 20 Wm. and Mary L. Rev. 125, 155 (1978); *Harbeson v. Parke-Davis*, 98 Wash. 2d 460, 656 P. 2d 483 (1983). The theoretical bases of the actions concerned herein are closely related in that all are founded essentially upon a theory of negligence or medical malpractice, and reflect the claims of an impaired child and other members of his immediate family against a physician and other health care provider for their failure to properly advise the mother about amniocentesis and the availability of genetic counseling. *See Procanik v. Cillo*, 97 N.J. 339, 478 A. 2d 755 (1984). Although there are obvious similarities between the causes of actions which plaintiffs seek to assert, there are also crucial differences as shall be demonstrated by our analysis of each proposed cause of action.

## III

The first issue we shall address is whether a cause of action for "wrongful life" may be maintained in this state. In the context of the present case, this issue is framed as whether the trial court erred in dismissing Michael Azzolino's claim for wrongful life pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The only purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of the pleading against which it is directed. *Sutton v. Duke*, 277 N.C. 94, 176 S.E. 2d 161 (1970). In deciding such a motion the trial court is to treat the allegations of the pleading it challenges as true. *Smith v. Ford Motor Co.*, 289 N.C. 71, 221 S.E. 2d 282 (1976). A cause of action should not be dismissed for failure to state a claim upon which relief can be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *See O'Neill v. Bank*, 40 N.C. App. 227, 252 S.E. 2d 231 (1979).

The cause of action brought by Michael Azzolino sets forth a claim for what is often referred to as "wrongful life." A wrongful life claim is one brought by or on behalf of an impaired child who alleges that but for the defendant doctor or health care provider's negligent advice to or treatment of his parents, the child would not have been born. *See Harbeson* and *Procanik, supra*; Comment, " 'Wrongful Life': The Right Not To Be Born," 54 Tul. L. Rev. 480, 484-85 (1980). The essence of the child's claim is that the defendants wrongfully deprived his parents of information which would

have prevented his birth. *See Procanik, supra* at 760. As stated in Comment, " 'Wrongful Life': The Right Not To Be Born," *supra* at 485:

> The child does not allege that the physician's negligence caused the child's deformity. Rather, the claim is that the physician's negligence — his failure to adequately inform the parents of the risk — has caused the birth of the deformed child. The child argues that but for the inadequate advice, it would not have been born to experience the pain and suffering attributable to the deformity.

In the present case, plaintiffs alleged as follows: During the spring of 1979, Mrs. Azzolino was in the first trimester of pregnancy and was accepted by defendants as their patient for prenatal medical care. Mrs. Azzolino advised the individual defendants that she was 36 years old and requested their medical advice with respect to the advisability of having a diagnostic procedure known as amniocentesis performed on her for the purpose of determining whether her fetus had genetic defects. In response to a direct question from Mrs. Azzolino regarding the advisability of this procedure, defendant Jean Dowdy spoke of her own personal and religious prejudices, and those of her husband, against the use of amniocentesis. She advised Mrs. Azzolino of the medical risks associated with amniocentesis, without setting those risks in the context of a complete risk-benefit analysis and thus unduly emphasized those risks.

In response to a similar question addressed to him, Dr. Dingfelder advised Mrs. Azzolino that she need not worry about amniocentesis because it was not necessary or advisable for her as the upswing was for women 37 years of age or older. Mr. and Mrs. Azzolino quite foreseeably relied upon the defendants' advice; therefore, Mrs. Azzolino did not undergo amniocentesis. In giving such advice to Mrs. Azzolino, and in failing subsequently to cure such advice, the individual defendants negligently departed from the standard of practice applicable to him or her. Dr. Dingfelder was also negligent in his supervision of Jean Dowdy. Defendant OCCHS is liable for the negligence of the individual defendants under the doctrine of respondeat superior. Had Mrs. Azzolino been properly advised, she would have had an amniocentesis performed which would have revealed that her fetus

had Down's Syndrome. Had she been informed that her fetus had Down's Syndrome, Mrs. Azzolino would have legally terminated her pregnancy by having an abortion. Instead, as a direct and proximate result of defendants' alleged negligence, Michael Azzolino was allowed to be born afflicted with Down's Syndrome and has been made to suffer a life with impairments to which nonexistence would be preferable.

We begin our analysis of Michael's proposed cause of action by determining whether it fits within the traditional tort framework. As with any action founded upon negligence, Michael, in order to successfully pursue his claim, must demonstrate the existence of a duty, the breach of which may be considered the proximate cause of the damages suffered by the injured party. *See Becker v. Schwartz*, 46 N.Y. 2d 401, 410, 386 N.E. 2d 807, 811 (1978); 57 Am. Jur. 2d Negligence § 33 (1971).

[2] First, we must determine whether the individual defendants owed a duty to Michael. Unless a duty exists, there can be neither a breach nor liability. W. Prosser, Handbook of the Law of Torts § 53 (4th ed. 1971). Here, the individual defendants allegedly accepted Mrs. Azzolino as their patient for prenatal care; therefore, they clearly had a duty to provide reasonable care for her. We believe the defendants' duty extended not only to Mrs. Azzolino but also to the fetus she was carrying. The recognition of such a duty is a logical extension of our Supreme Court's holding in *Stetson v. Easterling*, 274 N.C. 152, 161 S.E. 2d 531 (1968), that an infant can recover damages for prenatal negligence. "Since the child must carry the burden of infirmity that results from another's tortious act, it is only natural justice that it, if born alive, be allowed to maintain an action on the ground of actionable negligence." *Id.* at 156, 161 S.E. 2d at 534, quoting with approval *Gay v. Thompson*, 266 N.C. 394, 146 S.E. 2d 425 (1966). In *Stetson*, the Supreme Court impliedly recognized that a duty of care is owed to a child that is in utero at the time negligent acts occur. However, liability for breach of that duty is conditioned upon the subsequent live birth of the child. *See Cardwell v. Welch*, 25 N.C. App. 390, 213 S.E. 2d 382, *cert. denied*, 287 N.C. 464, 215 S.E. 2d 623 (1975).

We believe the defendants' duty required them to provide the plaintiff parents with material information about genetic risk

so as to enable them to decide whether to avoid Michael's birth. While the disclosure of such information to the parents does not force them to prevent the child's birth, it does make them aware of the possibility or probability that their future children will be genetically impaired and gives them an opportunity to decide whether life is best for the child. *See* Note, "Wrongful Life . . ." *supra*, 20 Wm. and Mary L. Rev. at 140. Thus, defendants' duty required that they afford Michael, vicariously through his parents, an opportunity to be relieved of a life with impairments. *Id. See also, Harbeson, supra* at 491. Defendants did not have a duty to prevent Michael's birth. Defendants' duty was to provide the plaintiff parents with complete and accurate information about any genetic risks of which they needed to be aware.

Before liability for negligence can be imposed on defendants, plaintiffs must also show that defendants breached their duty by failing to conform to the appropriate standard of care. *See* W. Prosser, Handbook of the Law of Torts § 30 (4th ed. 1971). It does not appear beyond doubt in this case that plaintiffs cannot prove such breach by defendants; therefore, the cause of action for wrongful life is not fatally defective on this basis.

[3] We must next determine whether the defendants' alleged negligence proximately caused the injury allegedly suffered by Michael, his birth itself. Assuming for the moment that Michael has suffered a legally cognizable injury and taking the allegations of the complaint as true, we find the complaint states a sufficient causal relationship between the defendants' alleged negligence in advising Mrs. Azzolino about amniocentesis and the subsequent birth of Michael Azzolino to withstand a Rule 12(b)(6) motion to dismiss. An argument is often made in wrongful life cases that the maternal illness or genetic condition, not the physician's negligence, was the proximate cause of the child's injury. *See Smith v. United States*, 392 F. Supp. 654 (N.D. Ohio 1975); *Gleitman v. Cosgrove*, 49 N.J. 22, 227 A. 2d 689 (1967). This argument has been repeatedly rejected because it misinterprets the gravamen of the complaint, which is that the defendants' negligence precluded any parental decision to abort the fetus. *See Phillips v. United States*, 508 F. Supp. 537 (D.C.S.C. 1980) (hereinafter *"Phillips I"*); *Robak v. United States*, 658 F. 2d 471 (7th Cir. 1981); *Gildiner v. Thomas Jefferson Univ. Hosp.*, 451 F. Supp. 692 (E.D. Pa. 1978). The relevant causal relationship in wrongful life cases

is between the defendant's negligence and the subsequent birth of the child, not between the defendant's negligence and the genetically impaired condition of the child.

We believe any objections to the recognition of Michael Azzolino's cause of action for wrongful life based on lack of proximate cause are overcome by his parents' allegations that had they received adequate information from defendants, they would have aborted the fetus. Moreover, we believe the birth of Michael Azzolino in an impaired state was clearly a foreseeable consequence of the defendants' alleged negligence; therefore, his cause of action is not fatally defective on the ground that his injury was not reasonably foreseeable.

[4] Next, we consider the most problematical element in the analysis of the wrongful life claim—injury and the extent of damages. The majority of courts which have considered wrongful life claims have refused to recognize their validity concluding either that the child had not sustained a legally cognizable injury or that appropriate damages were impossible to ascertain. *See, e.g., Becker, supra; Gildiner v. Thomas Jefferson Univ. Hosp.*, 451 F. Supp. 692 (E.D. Pa. 1978); *Dumer v. St. Michael's Hosp.*, 69 Wis. 2d 766, 233 N.W. 2d 372 (1975); *Moores v. Lucas*, 405 So. 2d 1022 (Fla. App. 1981). However, in recent years a trend has emerged towards allowing an impaired child to maintain an action for wrongful life in order to recover as special damages the extraordinary expenses to be incurred during the child's lifetime as a result of his impairment. *See Turpin v. Sortini*, 31 Cal. 3d 220, 182 Cal. Rptr. 337, 643 P. 2d 954 (1982); *Harbeson v. Parke-Davis*, 98 Wash. 2d 460, 656 P. 2d 483 (1983); *Procanik v. Cillo*, 97 N.J. 339, 478 A. 2d 755 (1984). Even these jurisdictions, however, have refused to recognize the child's claim for general damages on the ground it is impossible to assess general damages in any fair, nonspeculative manner. *Id.* For the reasons that follow, we conclude Michael has suffered a legally cognizable injury for which he may recover as special damages the extraordinary expenses to be incurred during his lifetime as a result of his impairment.

In a wrongful life action, the injury suffered by the plaintiff child is his very existence itself. The essence of the child's claim is that because of his impairments, he would have been better off had he not been born. Some courts have refused to recognize an

action for wrongful life on the ground that the injury which the child has suffered is not a legally cognizable one because "considerations of public policy dictate a conclusion that life—even with the most severe of impairments—is, as a matter of law, always preferable to nonlife." *Turpin, supra* at 961. *See, e.g., Berman v. Allan*, 80 N.J. 421, 404 A. 2d 8 (1979), *overruled* in *Procanik, supra; Phillips I, supra*. It has been argued that even though the impaired child may experience a great deal of physical and emotional pain and suffering, he or she will still be able "to love and be loved and to experience happiness and pleasure—emotions which are truly the essence of life and which are far more valuable than the suffering she (or he) may endure." *Berman, supra*, 80 N.J. at 430, 404 A. 2d at 13.

While we agree this may be arguably true in some cases, we do not agree it is always or necessarily so. We are unwilling, and indeed, unable to say as a matter of law that life even with the most severe and debilitating of impairments is always preferable to nonexistence. We believe that a child, who is as severely impaired as Michael Azzolino, has suffered a legally cognizable injury; therefore, Michael's action for wrongful life should not be dismissed for lack of actionable injury.

With respect to the question of damages, we agree with the position taken by other courts that a child's claim for general damages for being born impaired as opposed to not being born at all should be denied because of the impossibility of assessing such damages in any fair, nonspeculative manner. *See Turpin, Procanik*, and *Harbeson, supra*. Under traditional tort principles, damages are generally intended to restore an injured person as nearly as possible to the position he would have been in but for the defendant's negligence. *See* C. McCormick, Damages § 137 (1935); *Gleitman v. Cosgrove*, 49 N.J. 22, 227 A. 2d 689 (1967). *See also Phillips v. Chesson*, 231 N.C. 566, 58 S.E. 2d 343 (1950). In a wrongful life case, there is a problem with this remedy because had the defendant's negligence not occurred, the plaintiff child would not have been born. As stated by the court in *Becker v. Schwartz*, 46 N.Y. 2d 401, 412, 386 N.E. 2d 807, 812 (1978): "[A] cause of action brought on behalf of an infant seeking recovery for wrongful life demands a calculation of damages dependent upon a comparison between the Hobson's choice of life in an impaired state and nonexistence. This comparison the law is not

equipped to make." Since there does not appear to be any rational, nonspeculative way to measure the child's general damages, we agree that such damages should not be recoverable.

On the other hand, the child's special damages for the extraordinary expenses to be incurred during the child's lifetime as a result of his impairment are reasonably certain and readily ascertainable, and therefore, should be recoverable. The expenses to which we are referring consist of the extraordinary costs of special treatment, teaching, care, medical services, aid and assistance for the child because of his impairment. Indeed, it is only fair to place the burden of paying those expenses on the defendant whose negligence was a proximate cause of the child's need for such special care. As stated by Justice Jacobs of the New Jersey Supreme Court in his dissenting opinion in *Gleitman v. Cosgrove, supra,* 227 A. 2d at 703: "While the law cannot remove the heartache or undo the harm, it can afford some reasonable measure of compensation toward alleviating the financial burdens." The question remains, however, of who is entitled to recover for those expenses — the child himself or his parents.

The majority of courts have allowed parents bringing wrongful birth actions to recover for those expenses incurred by them and likely to be incurred by them in the future as a result of their child's impairment, but have refused to recognize the right of the child to sue on his own behalf to recover these or any other damages. *See, e.g., Moores, supra; Becker, supra.* The parents' right to recover these expenses is of course based upon their support obligation. The highest courts of three states — Washington, California, and New Jersey — have held that an impaired child has a right to recover these damages on his own behalf by bringing an action for wrongful life, and have indicated that either the parents or the child, but not both, may recover for these extraordinary expenses. *See Harbeson, Turpin,* and *Procanik, supra.* These courts have reasoned that it would be illogical and anomalous to permit only the parents, and not the child, to recover for these expenses because the right to recover for them should not depend upon the wholly fortuitous circumstance of whether the parents are available to sue or whether the expenses are incurred at a time when the parents remain legally responsible for providing such care. *Id.*

We agree it would be illogical and unjust to permit only the parents and not the child to recover for these expenses because to hold otherwise would in some situations deprive the child of the recovery to which he is entitled. However, we believe the right to recover for the cost of the extraordinary care needed by the child because of his impairment should be vested in the child alone. Under North Carolina law, when an unemancipated minor suffers injuries by reason of the tortious conduct of another, the minor's parents because of their support obligation are ordinarily deemed to have the right to recover for pecuniary expenses incurred or likely to be incurred by them as a consequence of the injury including the expenses of medical treatment. 3 R. Lee, N.C. Family Law § 241 (4th ed. 1981). However, this is not the ordinary case, and we believe the unusual nature of the wrongful life and wrongful birth actions justify a departure from the usual rule.

It is the child who must bear the burden of his impairment, and though the parents must bear the burden of paying for much, if not all, of the special care required because of the child's impairment because of their support obligation, it is the child who suffers if the money is not there to pay for the care that he needs. For that reason, we feel it is best to permit the child to sue on his own behalf, through his guardians, for these special damages. This will ensure that the recovery is used for its intended purpose — to pay for the extraordinary care required by the child because of his impairment — and not for any other purpose by the parents. Of course, the parents should be entitled to disbursements from the child's recovery for reasonable expenses incurred by them for special care for the child subject to the approval of the clerk of superior court. See G.S. 33-1, et seq. Thus, allowing the child to sue on his own behalf, through his guardians, will not only best protect the interests of the child, it will not in any way injure the interests of the parents.

We conclude that an action for wrongful life sufficiently conforms to the traditional tort framework and contains the requisite elements for a negligence action. It has been argued in other jurisdictions that policy considerations, other than the ones we have previously discussed herein, compel the disallowance of a wrongful life claim, see, e.g., Phillips I, supra at 543, but we find these arguments unpersuasive. Rather, we believe policy considerations

weigh in favor of recognition of the wrongful life action, as well as the wrongful birth action, because recognition of both will "promote societal interests in genetic counseling and prenatal testing, deter medical malpractice, and at least partially redress a clear and undeniable wrong." (Footnotes omitted.) Rogers, "Wrongful Life and Wrongful Birth: Medical Malpractice in Genetic Counseling and Prenatal Testing," 33 S.C. L. Rev. 713, 757 (1982) (hereinafter "*Rogers*").

Accordingly, we hold that an impaired child may maintain an action for wrongful life in order to recover as special damages the extraordinary expenses to be incurred during the child's lifetime as a result of his impairment and that the cause of action asserted by Michael Azzolino sufficiently sets forth a claim for wrongful life; therefore, the trial court erred in dismissing Michael's claim.

## IV

[5] Next, we shall consider whether a cause of action may be maintained by the minor siblings of a "wrongfully born" child for damages allegedly suffered by them as a result of the wrongful birth. Plaintiffs contend the trial court erred in dismissing the cause of action brought by the minor half-siblings of Michael Azzolino for failure to state a claim upon which relief can be granted, and in striking paragraph 3 of the complaint in which the siblings alleged that they reside with the plaintiff parents. The siblings claim they have been damaged by their brother's wrongful birth in that they must suffer the family hardships, financial, emotional and otherwise, associated with having a Down's Syndrome child in the family; and have been and will continue to be deprived of the full measure of the society, comfort, care, and protection of the plaintiff parents because of the extraordinary demands placed on them by Michael; and that defendants should have reasonably foreseen that their negligence would result in such damage to the siblings.

Our research has not disclosed any appellate court decisions, of this or any other jurisdiction, in which the precise question presented here has been addressed. However, six jurisdictions have considered and rejected similar claims brought by siblings of a normal, healthy child born after a negligently performed sterilization procedure. *See Aronoff v. Snider*, 292 So. 2d 418 (Fla. App. 1974); *Cox v. Stretton*, 77 Misc. 2d 155, 352 N.Y.S. 2d 834 (1974);

*Coleman v. Garrison*, 349 A. 2d 8 (Del. 1975); *Sala v. Tomlinson*, 73 A.D. 2d 724, 422 N.Y.S. 2d 506 (1979); *Miller v. Duhart*, 637 S.W. 2d 183 (Mo. App. 1982); *White v. United States*, 510 F. Supp. 146 (U.S.D.C. 1981). Like the present case, the siblings in these cases claimed that their sibling's birth diminished their share of their parents' society, comfort, care, protection and financial support.

In most of these cases, the siblings' cause of action was summarily rejected on the ground there is no basis in law or logic for such an action. *See, e.g., Aronoff, White,* and *Miller, supra.* In *Cox, supra,* the court discussed the merits of the cause of action at greater length and reached the same conclusion on the grounds that there was no duty owed by the defendant to the siblings, no violation of the siblings' fundamental right which would support their claim, and no allegation in the complaint of injury to the siblings themselves. The court further stated:

> While children may expect "future care, affection, training and financial support," they have no vested right to it. . . . There is no "proportional" share of their parents' worldly goods to which children are entitled and except that parents are bound to provide for their children and keep them from the public rolls . . ., infants are not entitled as a matter of right to any specific share of their parents' wealth, much less their "care," "affection" or "training."

352 N.Y.S. 2d at 840.

The present case differs from these cases only in that the siblings here seek additional damages for emotional and other hardships suffered by them because of Michael's impairment. Despite these differences, we believe the siblings' claim in the present case is substantially the same as the siblings' claim in the above-cited cases and is equally lacking in merit.

We shall briefly address the theories under which the siblings seek to bring their action. The siblings contend their claim is cognizable either as a negligence action, or under a theory of nuisance per accidens, or under a theory of loss of parental consortium. We disagree. To begin with, the siblings' claim fails under a negligence theory because it does not evince the required elements for a negligence action. *See Prosser, supra* at § 30. Specifically, there was no duty owed by defendants to the sib-

lings. Secondly, the siblings' reliance on the theory of nuisance to justify recognition of their claim is misplaced. Nuisance is a theory of tort liability which rests upon an unreasonable interference with one's use and enjoyment of land. *Morgan v. Oil Co.*, 238 N.C. 185, 77 S.E. 2d 682 (1953). Since there is no property interest at stake here, this theory is inapplicable. Furthermore, we find the idea of classifying a child who is impaired, such as Michael Azzolino, as a nuisance for legal purposes to be morally repugnant.

Lastly, we reject the siblings' argument that their claim is legally cognizable under a theory of loss of parental consortium. Though the courts of this state have not previously considered whether a child may bring an action for loss of his parents' society, comfort, care, and protection where such loss was caused by the negligence of a third person, our Supreme Court has rejected such a claim where it was alleged the third person intentionally caused such loss. *See Henson v. Thomas*, 231 N.C. 173, 56 S.E. 2d 432 (1949). *Henson* concerned a civil action brought by minor children to recover damages for criminal conversation with and alienation of the affections of the children's mother. The children alleged that the defendant, by seducing and alienating the affections of their mother, caused them to lose the companionship, guidance and care of their parents. The Supreme Court phrased the question presented in the case and its holding as follows:

> May children, acting through their father as next friend, maintain an action against a third party for damages for wrongfully disrupting the family circle and thereby depriving them of the affection, companionship, guidance and care of their parents? This is the question posed for decision. We are constrained to answer in the negative.

*Id.* at 174, 56 S.E. 2d at 433. In denying the children's claim, the Court stated:

> The asserted cause of action was not known to the common law. It has no statutory sanction. It is not for the courts to convert the home into a commercial enterprise in which each member of the group has a right to seek legal redress for the loss of its benefits.

*Id.* at 176, 56 S.E. 2d at 434. We believe the Court's language in *Henson* applies with equal force to the present situation and compels us to reject the siblings' argument based on loss of parental consortium.

We conclude that there is no basis in law for the siblings' cause of action and affirm the rulings of the trial court dismissing their claim and striking paragraph 3 of the complaint. We note that much of the damage to the siblings' interests, particularly with respect to the extraordinary financial burden placed on the family by the birth of the impaired child, is compensated for by the damages recovered in the wrongful life action.

V

[6]  Next we consider the cause of action brought by Mr. and Mrs. Azzolino, the plaintiff parents. As stated previously, the plaintiff parents alleged that the defendants were negligent in their prenatal care of Mrs. Azzolino in that they failed to properly advise her with respect to amniocentesis and the availability of genetic counseling; that had Mrs. Azzolino been properly advised, she would have had amniocentesis performed which would have revealed that her fetus had Down's Syndrome; and that had she been informed that her fetus had Down's Syndrome, she would have terminated the pregnancy. In essence, the parents' claim is that Michael's birth was wrongful in that had it not been for the defendant's negligence, the parents would have prevented Michael's birth.

Though not labeled as such in the complaint, the plaintiff parents' cause of action sets forth a claim for "wrongful birth." A wrongful birth action is an action brought by parents against a physician or other health care provider who allegedly failed to inform them of the increased possibility that the mother would give birth to a child suffering from birth defects thereby precluding an informed decision about whether to have the child. *See* Comment, "*Berman v. Allen*," 8 Hofstra L. Rev. 257, 257-8 (1979), cited in *Harbeson, supra* at 487. In a wrongful birth action, the parents claim that but for the negligence of the physician or other health care provider they would have avoided conception or terminated the pregnancy. *Jackson v. Bumgardner*, 71 N.C. App. 107, 321 S.E. 2d 541 (1984); *see also Harbeson* and *Berman, supra*.

As we noted in *Jackson, supra*, this type of action is to be distinguished from an action for wrongful conception or wrongful pregnancy (hereinafter "wrongful pregnancy") which is an action brought by parents of a healthy, but unplanned, child against a physician or other health care provider for negligently performing a sterilization procedure or an abortion, or against a pharmacist or pharmaceutical manufacturer for negligently filling a contraceptive prescription. In a wrongful pregnancy action, the defendant's negligence was allegedly a proximate cause of the birth of a healthy, but unplanned, child; whereas in a wrongful birth action, the defendant's negligence was allegedly a proximate cause of the birth of an impaired child. *See Jackson, supra.* Although there are obvious similarities between wrongful birth and wrongful pregnancy actions, it is important to distinguish between them because other jurisdictions have consistently treated them differently particularly with respect to damages. *See Harbeson, supra.*

The appellate courts of this state have not previously considered the validity of a wrongful birth action. However, this Court has recognized that an action for wrongful pregnancy is legally cognizable under existing legal principles of this jurisdiction. *See Pierce v. Piver*, 45 N.C. App. 111, 262 S.E. 2d 320, *appeal dismissed*, 300 N.C. 375 (1980). Though certainly not conclusive, this does provide support for recognition of the wrongful birth action. Also weighing in favor of recognition of this cause of action is the fact that the jurisdictions that have considered wrongful birth actions are currently unanimous in their recognition of its validity. *See Phillips v. United States*, 508 F. Supp. 544, 549 (D.C.S.C. 1981) (hereinafter "*Phillips II*") and the cases cited therein.

Some of the earlier decisions refused to recognize the validity of the wrongful birth action because of the perceived impossibility of ascertaining damages and the public policy against abortion. *See, e.g., Gleitman v. Cosgrove*, 49 N.J. 22, 227 A. 2d 689 (1967). These rationales for rejecting the cause of action are no longer considered valid. *See, e.g., Berman v. Allan*, 80 N.J. 421, 404 A. 2d 21 (1979). *See also Phillips II, supra* at 549-550. In fact, it now appears that policy considerations support, rather than militate against, recognition of the action for wrongful birth. *Accord, Phillips II* and *Berman, supra*. Refusing to recognize the

cause of action "would in effect immunize from liability those in the medical field providing inadequate guidance to persons who would choose to exercise their constitutional right to abort fetuses which, if born, would suffer from genetic defects. (Citations omitted.)" *Berman v. Allan*, 80 N.J. at 432, 404 A. 2d at 14.

Clearly, the cause of action for wrongful birth fits comfortably within the traditional tort framework and contains the required elements for a negligence action—duty, breach, proximate cause, and damages. Except for the more difficult element of damages, we need only discuss these briefly. In wrongful birth actions, the defendant's professional relationship with the mother clearly establishes a duty of due care. The question of whether the defendant breached his duty must be determined by expert testimony and is not a matter which bars recognition of the cause of action. As with the wrongful life action, we believe the parents' allegations that had they been properly informed regarding the risk of genetic defects, they would have terminated the pregnancy or avoided conception are sufficient to establish that the defendant's alleged negligence was a proximate cause of the parents' damages.

With respect to damages, courts have disagreed as to the measure of damages but have agreed that at least some damages are recoverable. *See Rogers, supra* at 750-752; *Phillips II, supra* at 551. Some courts allow the parents to recover damages only for the extraordinary expenses relating to the child's impairment which must be borne by them. *See Becker* and *Moores, supra; see also Jacobs v. Theimer*, 519 S.W. 2d 846 (Tex. 1975). These expenses would be those which are over and beyond the expenses parents would normally incur in raising a healthy child. Other courts allow the parents to recover damages only for their pain and suffering and mental anguish resulting from the birth of the impaired child. *See Karlsons v. Guerinot*, 57 A.D. 2d 73, 394 N.Y.S. 2d 933 (1977); *Berman, supra*. Still others allow recovery for both mental anguish and the extraordinary expenses relating to the child's impairment. *See Eisbrenner v. Stanley*, 106 Mich. App. 357, 308 N.W. 2d 209 (1981); *Harbeson, supra*. One court has even allowed the parents to recover all the expenses incident to the care of the child without reducing the amount of the recovery by the cost of raising and supporting a normal, healthy child. *See Robak v. United States*, 658 F. 2d 471 (7th Cir. 1981).

In the present case, the parents seek to recover damages for the medical and hospital expenses of the pregnancy and childbirth; damages for the nervousness, inconvenience, physical restrictions, loss of consortium, and anxiety suffered by them because of the pregnancy and childbirth; damages for the mental anguish which they have endured and will continue to endure because they have brought into the world a child afflicted with Down's Syndrome; the ordinary and extraordinary cost of supporting, educating, and providing the attention for Michael which he requires; damages for past and future loss or diminution of the consortium of each other because of the extraordinary demands placed on them by Michael; damages for Mrs. Azzolino's lost earnings occasioned by her pregnancy and by the need for her to care for Michael on a daily basis; and other miscellaneous damages. We agree that at least some of these damages are recoverable; therefore, the plaintiff parents' cause of action is not fatally deficient for lack of ascertainable damages.

In determining what damages are recoverable, we again have a problem applying traditional tort principles which dictate that damages are intended to restore the injured person to the position he would have been in but for the defendant's negligence. *See* C. McCormick, *supra.* In a wrongful birth action, had the defendant's negligence not occurred, the parents would have terminated the pregnancy and would not have incurred any of the costs for which they seek recovery, nor would they have suffered the loss of consortium and mental anguish resulting from the birth of the impaired child. However, allowing the parents to recover for all the damages proximately resulting from the defendant's negligence would inflict a penalty on the defendants that is wholly disproportionate to the culpability involved and would place an unreasonable financial burden upon health care providers. *Accord, White v. United States,* 510 F. Supp. 146 (U.S.D.C. 1981); *Berman, supra.* For that reason, we feel it is necessary as a matter of public policy to limit the damages recoverable in this type of action.

Of course, allowance of certain damages to compensate the parents is necessary to redress the harm done. We believe the appropriate balance is to allow the parents to recover damages only for the mental anguish which they have endured and will continue to endure as a result of the birth of the impaired child. As we

stated earlier in this opinion, the impaired child may recover on his own behalf damages for the extraordinary expenses to be incurred during his lifetime as a result of his impairment, and the parents are entitled to disbursements from the child's recovery for the extraordinary expenses incurred by them in supporting and caring for the child. Therefore, the parents are compensated indirectly for these damages as well. In other words, we believe the parents' recovery, whether direct or indirect, should be limited because of policy considerations to those damages resulting directly from the child's impairment, and that the defendants should not be held liable for those damages or expenses which would ordinarily result from the birth of a normal, healthy child.

We conclude that the proposed cause of action for wrongful birth is legally cognizable under existing legal principles in this state and that the trial court correctly permitted the plaintiff parents here to proceed to trial on their claim.

As stated previously, at the close of the plaintiff parents' presentation of evidence at trial, the court directed verdicts in favor of each of the defendants. Plaintiffs contend this was error and that the evidence when considered in the light most favorable to them was sufficient to support a recovery against each defendant. It is well established that in considering a defendant's motion for a directed verdict, the plaintiff's evidence must be taken as true and considered in the light most favorable to the plaintiff, giving him the benefit of every reasonable inference to be drawn therefrom. *Clark v. Bodycombe*, 289 N.C. 246, 221 S.E. 2d 506 (1976). "A directed verdict is improper unless it appears as a matter of law that plaintiff cannot recover under any view of the facts which the evidence reasonably tends to establish." *Willoughby v. Wilkins*, 65 N.C. App. 626, 310 S.E. 2d 90 (1983), *disc. rev. denied*, 310 N.C. 631, 315 S.E. 2d 697, 698 (1984).

The plaintiff parents' claim is based on the alleged negligence of defendants Jean Dowdy and Dr. Dingfelder in the performance of their professional medical services. In order to withstand defendants' motions for directed verdicts, plaintiffs were required to offer evidence establishing the following: (1) the standard of care applicable to each individual defendant; (2) breach of the standard of care; (3) proximate causation; and (4) damages. *Lowery v. Newton*, 52 N.C. App. 234, 278 S.E. 2d 566 (1981). If plain-

tiffs failed to present sufficient evidence of any one of these elements, a directed verdict against them was proper.

A. *The directed verdict in favor of Jean Dowdy*

[7]   The evidence with respect to defendant Jean Dowdy tends to show the following: On 13 March 1979, Mrs. Azzolino went to the Haywood-Moncure Clinic maintained by the corporate defendant OCCHS for treatment for an injured finger. While there, she had a pregnancy test performed which turned out to be positive. After learning that prenatal care was available at the Clinic, Mrs. Azzolino made return appointments to see family nurse practitioner Jean Dowdy and Dr. Dingfelder.

Mrs. Azzolino returned the following week and was examined by Jean Dowdy. Mrs. Azzolino testified that during the examination the following conversation took place:

> On that prenatal visit I told Jean Dowdy that I would like to have amniocentesis. She looked at me kind of strange and asked why. I told her I was 36 and understand that there is a higher risk of having a Down's Syndrome child when you are 35 or over. She asked if I realized that it is a very dangerous procedure in that the technician, when he inserts the needle, can hit a baby's vital organ and that you can have a miscarriage and can bleed. She went on to say that when she was pregnant, she was concerned about a sickle cell trait and wanted to have an abortion, but her husband advised her that they should leave it in God's hands.

Mrs. Azzolino further testified that Jean Dowdy did not ask her to discuss amniocentesis with anyone else, nor did she inform Mrs. Azzolino of other places she could go to discuss it.

This conversation between Mrs. Azzolino and Jean Dowdy is the sole basis for the plaintiff parents' claim against Jean Dowdy. Plaintiffs contend Jean Dowdy was negligent in advising Mrs. Azzolino as she did and that her negligence was a proximate cause of their injuries. We disagree. Mrs. Azzolino testified that her conversation with Jean Dowdy did not affect her decision regarding amniocentesis and that she was still determined to have it after their conversation took place. Furthermore, Mr. Azzolino testified as follows:

The first conversation my wife reported to me was the one she had with Jean Dowdy. That in no way affected my decision as to what we were going to do. I wanted her to talk to the doctor about it.

The evidence clearly shows that Jean Dowdy's alleged negligence did not influence Mr. and Mrs. Azzolino in any way in their decision to forego amniocentesis; therefore, the necessary causal connection between the alleged negligence and the plaintiffs' damages was not established. Since plaintiffs failed to show that the alleged negligence of Jean Dowdy was a proximate cause of their damages, the directed verdict in her favor was proper. *Accord*, Weatherman v. White, 10 N.C. App. 480, 179 S.E. 2d 134 (1971).

### B. *The directed verdict in favor of Dr. Dingfelder*

First, we consider plaintiff's argument that Dr. Dingfelder may be held liable for the negligence of Jean Dowdy under the doctrine of respondeat superior. Assuming arguendo that the relationship between Dr. Dingfelder and Jean Dowdy was sufficient to justify application of this doctrine, plaintiffs could not prevail at trial based on this theory. The liability of the employer or master under the doctrine of respondeat superior cannot be in excess of that of the employee or servant. 8 Strong's N.C. Index 3d Master and Servant § 32 (1977). Since the evidence was not sufficient to support a verdict for plaintiffs against Jean Dowdy, the employee here, it was not sufficient to support a verdict for them against Dr. Dingfelder, the employer, based on this theory. For this same reason, we reject plaintiffs' argument that OCCHS is vicariously liable for the actions of Jean Dowdy.

Secondly, plaintiffs seek to hold Dr. Dingfelder liable based on his own negligence in advising Mrs. Azzolino concerning amniocentesis. G.S. 90-21.12 sets forth the standard of proof necessary to establish medical malpractice as follows:

> In any action for damages for personal injury or death arising out of the furnishing or the failure to furnish professional services in the performance of medical, dental, or other health care, the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health

care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action.

The evidence with respect to Dr. Dingfelder tends to show the following: On 28 March 1979, Mrs. Azzolino returned to the Clinic and was examined by Dr. Dingfelder. During that visit, Mrs. Azzolino told Dr. Dingfelder that she would like to have amniocentesis. Mrs. Azzolino described Dr. Dingfelder's response to her statement and the advice she was given as follows:

[H]e asked me why I was worried about that. I told him that I hear that 35 and up you have a higher risk of having a Down's child and he told me not to be concerned with that, its (sic) 37 and up, not 35. . . . I was in the examining room around 10 minutes.

An examination was performed that day. Dr. Dingfelder asked me my age and I told him 36. I told him that I had been spotting and was concerned about that because that had never happened to me before. He asked me about, I guess, having trouble during my pregnancies. I really can't remember any specific questions that he asked me. He said nothing else about amniocentesis, nor did I say anything to him.

. . . I was not given any information on that day that indicated that there was a genetic counseling center at the University of North Carolina but discovered that there was a center there after my son was born.

. . . After my March 28 visit with Dr. Dingfelder, I had no further discussions with anyone there about amniocentesis.

Mrs. Azzolino continued to receive prenatal care at the Clinic for the remainder of her pregnancy. On 11 October 1979, she gave birth to Michael at North Carolina Memorial Hospital. The parties stipulated that Michael Azzolino was born with a permanent genetic defect known as Down's Syndrome which is characterized by mental retardation and other physical abnormalities.

Mrs. Azzolino testified that shortly after Michael was born, Dr. Aylsworth, who was at the time assistant professor of pediatrics and director of the genetic counseling program at the University of North Carolina, and Dr. Dingfelder took her into a conference room to discuss Michael's condition. She described their conversation in part as follows:

> . . . Dr. Aylsworth told me that they thought Michael might have Down's Syndrome and he asked me whether I had ever heard of amniocentesis and I told him "yes" and that I had asked Dr. Dingfelder who was sitting right there, for it and that he told me I didn't need it, that it was 37 and up. Dr, Aylsworth looked at Dr. Dingfelder and Dr. Alysworth said "yes, but you were too late in your pregnancy to have it." Then I was hysterical . . . Dr. Dingfelder did not talk to me that day, he just patted my leg on the way out the door. He did not say anything to me.

Other evidence presented at trial tended to show that on 28 March 1979 when Mrs. Azzolino inquired about amniocentesis, she was not too far along in her pregnancy to have had amniocentesis and received the results of it back in time for her to have legally terminated her pregnancy.

The parties stipulated that in 1979 Dr. Dingfelder was a physician licensed to practice medicine in North Carolina and that he specialized in obstetrics and gynecology. Evidence was presented which showed that Dr. Dingfelder was on the faculty at the UNC School of Medicine, that he was on the staff at North Carolina Memorial Hospital (hereinafter "NCMH"), and that he served as a consultant one half day per week at the Haywood-Moncure Clinic where he saw gynecological and obstetrical patients and supervised the work of the family nurse practitioners there.

Paul Alston, project director for OCCHS, testified that the policy for genetic counseling at OCCHS was "to provide such information to enable patients to understand medical possibilities and to utilize counseling services available elsewhere." Dr. Phillip A. Buchanan, who was director of the Prenatal Counseling Clinic at NCMH and on the faculty at UNC School of Medicine in 1979, testified that his clinic would have provided a 36 year old pregnant woman with genetic counseling in 1979. He stated that in

1979 his clinic offered amniocentesis for women under the age of 37 whose sole indication for amniocentesis was age if they had high concern about their risk of having a chromosomally abnormal baby after receiving a full explanation of what was involved with the procedure and its benefits and disadvantages.

Dr. Buchanan testified that it was in keeping with the policy at NCMH for an obstetrician not to recommend amniocentesis to a 36 year old woman with no other genetic indications if the patient, during a visit to the doctor's office, did not demonstrate high concern during the discussion. He defined "high concern" as "sufficient concern to have talked to their obstetrician or someone. . . ." He indicated that it was at age 35 or 36 that the risk of Down's Syndrome became medically significant and outweighed the risks associated with the procedure used to diagnose it. He stated that during 1977 through 1979 Dr. Dingfelder had referred patients to the Prenatal Counseling Clinic who were under the age of 37 where referral was made solely on the basis of high concern.

Dr. Aylsworth also testified about the policy of NCMH in 1979 with respect to genetic counseling and amniocentesis. He said the policy was as follows: "We recommend amniocentesis for women 37 and over and were willing to consider it for women 35 and 36 if they were very anxious and had really high concern." He later testified that if Dr. Dingfelder did not affirmatively recommend amniocentesis to Mrs. Azzolino, who was 36 at the time Michael was born, that Dr. Dingfelder's actions would have been in accordance with the policy of Chapel Hill at that time.

[8] Defendants argue that Dr. Dingfelder's actions should be evaluated in light of the standard of care applicable to other obstetricians and gynecologists with similar training and experience practicing in Haywood-Moncure or a similar medical community during 1979, and that because plaintiffs failed to present evidence of this standard of care, the directed verdict for Dr. Dingfelder was proper. We disagree. We believe the standard by which Dr. Dingfelder's actions should be judged is that applicable to other obstetricians and gynecologists with similar training and experience practicing in Chapel Hill or a similar community.

As noted by Professor Robert G. Byrd in his article, "The North Carolina Medical Malpractice Statute," 62 N.C. L. Rev. 711, 713 (1984),

> [A]doption of the same or similar community rule presumably reflects the belief, based in large part on the well-worn distinction between the country doctor and the big city doctor, that the quality of medical practice differs with the character of communities and that the standard of care, to be fair, must reflect this difference.

Although Dr. Dingfelder practiced one half day per week in Haywood-Moncure and provided medical care for Mrs. Azzolino in that community, his practice was based primarily in Chapel Hill as demonstrated by the fact that he was a professor at the UNC School of Medicine and on the staff at NCMH. Given the extensive nature of his affiliation with NCMH in Chapel Hill, we feel it is most appropriate to judge his actions by the standard applicable there.

[9] We believe the testimony of Dr. Buchanan and Dr. Aylsworth describing the policy at NCMH regarding amniocentesis and genetic counseling was sufficient to establish the standard of care applicable to Dr. Dingfelder. We further believe that the evidence viewed in the light most favorable to plaintiffs was sufficient to establish that Dr. Dingfelder breached that standard of care. The evidence could reasonably be interpreted as showing that Mrs. Azzolino expressed high concern about the risk that the child she was carrying had Down's Syndrome in that she raised the question of amniocentesis herself and indicated that she had already decided to have the procedure. That being the case and because Mrs. Azzolino was 36 years old at the time, the jury could have concluded that Dr. Dingfelder should have informed her of the availability of genetic counseling at NCMH and/or explained to her more fully and accurately of the risk that her child might have genetic defects; and that having failed to so advise her, he was in negligent violation of the accepted standard of care in the community in which he practiced.

The evidence was also sufficient to establish the remaining two elements of plaintiffs' case—proximate cause and damages. With respect to proximate cause, the evidence showed the following: Mrs. Azzolino testified that when she thought she might be

pregnant, she and her husband decided to have amniocentesis because she was over 35. They had heard about amniocentesis through magazine articles and had discussed it in 1978 after Mrs. Azzolino's sister-in-law had it performed. They decided that if the test indicated a genetic defect, Mrs. Azzolino would have an abortion. Mrs. Azzolino admitted that very shortly after Michael was born, she told a doctor and social worker that she did not believe in abortion; however, the evidence shows that she had an illegal abortion in 1967 and an abortion in November, 1980.

Mrs. Azzolino testified that after her discussion with Dr. Dingfelder regarding amniocentesis, she had no more doubts about whether to have the procedure; that she had no further concern about having a child born with Down's Syndrome; and that what Dr. Dingfelder had told her had totally changed the decision that she and her husband had made more than a year earlier. Mr. Azzolino testified that he and his wife had decided that she would have amniocentesis if she got pregnant, and indicated they decided to forego amniocentesis because of Dr. Dingfelder's advice.

Dr. Buchanan testified that based on the data used in 1979, the genetic counseling center would have advised a woman who would have been 36 at the time of delivery that the risks associated with the amniocentesis procedure itself were between .5% and 1% whereas the risk that the woman, based solely on her age, would have a child with genetic defects was between .8% and 1%. Mrs. Azzolino stated that if she had been told there was a 50% chance of injury to the fetus occurring and a one in 2,000 chance of having a child with Down's Syndrome, she still would have had amniocentesis. The evidence further showed that the amniocentesis procedure was 99.6% accurate. We conclude that sufficient evidence was presented from which the jury could have found that had it not been for Dr. Dingfelder's negligence, Mrs. Azzolino would have had amniocentesis which would have shown that her fetus had Down's Syndrome; and that upon learning of the fetus' condition, she would have had an abortion. Therefore, the necessary causal connection was established.

With respect to damages, plaintiffs presented extensive evidence about Michael's impairment which showed the severity of his mental retardation and physical abnormalities, his need for ex-

traordinary medical treatment, and his need for continued care for the rest of his life. Evidence was also admitted concerning the emotional distress suffered by Mr. and Mrs. Azzolino resulting from the fact Michael has Down's Syndrome. We conclude that sufficient evidence of damages suffered by Mr. and Mrs. Azzolino as a result of Dr. Dingfelder's negligence was presented to withstand the motion for directed verdict.

We hold that the evidence viewed in the light most favorable to plaintiffs established all the essential elements of plaintiffs' case; therefore, the entry of a directed verdict for Dr. Dingfelder was improper.

C. *The directed verdict in favor of OCCHS*

[10]   Plaintiffs contend they presented sufficient evidence to support application of the doctrine of respondeat superior to hold OCCHS liable for the alleged negligence of Dr. Dingfelder. The doctrine of respondeat superior operates to make a principal vicariously liable for the tortious acts committed by his agent within the scope of his employment when the principal has the right to control the worker with respect to the manner and method of doing the work. *Vaughn v. Dept. of Human Resources*, 296 N.C. 683, 686, 252 S.E. 2d 792, 795 (1979). Conversely, a principal is not vicariously liable for the tortious acts of an agent or worker who is not subject to interference or control by the principal with respect to the manner or method of doing the work. *Id.* "The controlling principle is that vicarious liability arises from the right of supervision and control." *Id.* The right to control is determinative regardless of whether it is exercised or not. 8 Strong's N.C. Index 3d Master and Servant § 3 (1977).

The primary question here is whether the evidence viewed in the light most favorable to plaintiffs was sufficient to show that Dr. Dingfelder was subject to interference or control by the defendant OCCHS with respect to the manner or method of performing his duties at the Haywood-Moncure Clinic. The only evidence presented relevant to this issue was the testimony of Mr. Alston, project director of OCCHS, regarding the contractual arrangement between OCCHS and the University of North Carolina pursuant to which Dr. Dingfelder worked at the Haywood-Moncure Clinic. Mr. Alston testified that the medical director, presumably either for OCCHS or the Haywood-Moncure Clinic,

guided and supervised the physicians at the Clinic. We believe this was sufficient evidence from which it could be found that Dr. Dingfelder was subject to the supervision or control of OCCHS so as to justify the imposition of vicarious liability on OCCHS. We note that the evidence clearly shows that the alleged tortious acts of Dr. Dingfelder occurred within the scope of his employment at the Clinic. We hold the trial court erred in directing a verdict against plaintiffs in favor of defendant OCCHS.

## VI

[11] Next, plaintiffs contend the trial court erred in granting defendants' motion for summary judgment on the issue of punitive damages and in striking from the complaint plaintiffs' prayer for such relief. G.S. 1A-1, Rule 56(c) permits the granting of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." The courts of this state have generally held that punitive damages are recoverable where the tortious conduct which causes the injury is accompanied by an element of aggravation, as when the wrong is done wilfully or under circumstances of rudeness or oppression, or in a manner evincing a wanton and reckless disregard of the plaintiff's rights. *Robinson v. Duszynski*, 36 N.C. App. 103, 243 S.E. 2d 148 (1978). "In cases where plaintiff's action was grounded on negligence, our courts have referred to gross negligence as the basis for recovery of punitive damages, using that term in the sense of wanton conduct." *Id.* at 106, 243 S.E. 2d at 150.

Plaintiffs argue that they are entitled to punitive damages because after the birth of Michael Azzolino, defendants attempted to hide their malpractice by "fabricating a trail of evidence" tending to show that when Mrs. Azzolino first asked the individual defendants about amniocentesis she was already too far along in her pregnancy to have had amniocentesis and received the results back in time for her to have had a legal abortion in North Carolina. In opposition to defendants' motion for summary judgment on this issue, plaintiffs filed two affidavits. One was the affidavit of Mrs. Azzolino in which she states that shortly after Michael's birth, Dr. Dingfelder failed to contradict or correct the statement

of another physician to the effect that when Mrs. Azzolino inquired about amniocentesis she was too far along in her pregnancy to have had the procedure in time to have had a legal abortion; and that the dates on the medical records of her prenatal care at the Clinic are incorrect. In the second affidavit, a registered nurse states that she examined Mrs. Azzolino's medical records from NCMH which are supposed to be exact copies of the original medical records from the Haywood-Moncure Clinic and that she observed several distinct and easily identifiable differences in the contents of the two sets of records. The nurse concluded that in her experience such inconsistencies in medical records were not considered acceptable medical practice or ethically valid.

The injury suffered by plaintiffs in this case was allegedly caused by the individual defendants' failure to properly advise Mrs. Azzolino about the availability of genetic counseling and amniocentesis. Yet, the alleged conduct of defendants which serves as the basis for plaintiffs' claim for punitive damages occurred after Michael's birth and did not accompany the tortious conduct which caused plaintiffs' injury as required in order to sustain such a claim. For this reason, we hold that plaintiffs failed to set forth sufficient allegations to support a claim for punitive damages, and that the trial court's entry of summary judgment for defendants on this issue was proper.

## VII

Lastly, plaintiffs assign as error the trial court's exclusion of certain evidence at trial. Because plaintiffs are entitled to a new trial, we do not feel it is necessary to address these contentions.

In conclusion, our holding is as follows: That part of the orders entered on 14 December 1982 dismissing the cause of action brought by Michael Azzolino for wrongful life is reversed. That part of the orders entered on 14 December 1982 dismissing the cause of action brought by the minor siblings of Michael Azzolino, Regina Mary Gallagher and David John Azzolino, is affirmed. That part of the judgment entered on 24 May 1983 allowing defendant Jean Dowdy's motion for directed verdict against the plaintiff parents is affirmed. That part of the judgment entered on 24 May 1983 allowing the motions of defendants Dr. James Dingfelder and Orange-Chatham Comprehensive Health Services, Inc. for directed verdicts against the plaintiff parents is reversed.

The order entered on 6 May 1983 granting the defendants' motion for summary judgment on the issue of punitive damages is affirmed.

Affirmed in part; reversed in part.

Judges ARNOLD and WELLS concur.