**CONTINENTAL CASUALTY COMPANY, Plaintiff-Appellant and Cross-Appellee,**

**v.**

**EMPIRE CASUALTY COMPANY, a corporation, Defendant-Appellee and Cross-Appellant,**

**and**

**St. Paul Fire and Marine Insurance Company, a corporation; and Chicago Insurance Company, a corporation, Defendants-Appellees.**

**No. 83CA0139.**

Colorado Court of Appeals, Div. II.

June 27, 1985.

Rehearings Denied Aug. 15, 1985.

Certiorari Granted (Empire) Jan. 13, 1986.

Certiorari Granted (Chicago) Jan. 13, 1986.

Pryor, Carney & Johnson, P.C., Thomas L. Roberts, John L. Wheeler, Englewood, for plaintiff-appellant and cross-appellee.

Donald E. Cordova, P.C., Donald E. Cordova, Larry N. Harris, Denver, for defendant-appellee and cross-appellant.

Montgomery Little Young Campbell & McGrew, P.C., William H. ReMine, III, Englewood, for defendant-appellee St. Paul Fire and Marine Ins. Co.; Hansen & Breit, P.C., John L. Breit, Susan Smith Fisher, Denver, on brief.

Downey Law Firm, P.C., Arthur H. Downey, Kenneth G. Gulley, Denver, for defendant-appellee Chicago Ins. Co.

KELLY, Judge.

This case involves claims for declaratory and other relief to determine which insurance carriers had what coverage responsibilities for a jury verdict of $575,000 entered in an underlying medical malpractice action, *Peek v. Lockwood,* filed on behalf of Gary Peter Peek, a minor, against Gerald M. Lockwood, M.D.

Appellant, Continental Casualty Company, argues, among other grounds for reversal, that the trial court erred (1) in finding that Continental's policy covering Dr. Lockwood included professional liability; (2) in allowing the doctrine of waiver to be used to expand Continental's insurance coverage; (3) in holding that Continental was contractually obligated to pay a pro-rata share of post-judgment interest; and (4) in granting St. Paul's motion for summary judgment.

Appellee-Cross-Appellant, Empire Casualty Company, argues, among other grounds for reversal, that the trial court erred (1) in recognizing a cause of action for wrongful life by finding that two separate Empire policies were activated by Lockwood's negligence; (2) in refusing first to exhaust Lockwood's primary and excess insurance before reaching the primary insurance of Lockwood, M.D., P.C.; and (3) in binding the professional corporation to the judgment against Lockwood as an individual, pursuant to C.R.C.P. 106(a)(5). We affirm in part and reverse in part.

In the malpractice action, Lockwood made a general admission of liability. Thus, the issues concerning which of Lockwood's acts were negligent and which acts were a cause of Gary Peter Peek's injuries were not litigated until the trial in this case. A chronological chart of the operative events is appended to this opinion.

The malpractice claim arose from Lockwood's care and treatment of Shelly Peek for two separate pregnancies over a twenty-seven month period. Shelly Peek first went to Lockwood on July 25, 1972, for obstetrical care. Her blood was tested, but her RH factor was either mistyped or misrecorded, and Lockwood treated her throughout her pregnancy as having RH positive blood when in fact her blood was RH negative. Shelly Peek's husband, Randy Peek, had RH positive blood, thereby creating a risk of RH incompatability in their offspring.

In cases of RH incompatability, a drug called RhoGAM is usually administered to the mother within seventy-two hours after giving birth. The purpose of this drug is to prevent the mother from becoming "sensitized" to the infant's blood type, RH positive. Sensitization may cause devastating consequences to children in subsequent pregnancies. Because of Lockwood's error regarding Shelly Peek's blood type, Lockwood was unaware of the RH incompatability and, therefore, did not administer RhoGAM after the birth of her first child, Billy.

Shelly Peek became pregnant for the second time and consulted Lockwood for treatment of this pregnancy on March 22, 1974. Lockwood did not retype her blood. Complications resulted from this pregnancy and the child was stillborn on October 16, 1974. An autopsy was performed which was inconclusive as to the cause of death, and neither cord blood tests nor retyping of Shelly Peek's blood was done. If done, these tests might have revealed the RH incompatability. After the stillbirth, Lockwood advised Shelly Peek that she could have more children if she wished.

In 1975, Shelly Peek became pregnant for the third time and sought care from a different obstetrician who discovered the RH incompatability. On April 25, 1976, Gary Peter Peek was born. He suffered from a hemolytic disease known as erythroblastosis fatalis. He suffered a stroke in utero or shortly after his birth which resulted in substantial brain damage because of the premature delivery necessitated by his condition.

Throughout this period of time, Empire provided Lockwood with primary professional liability coverage pursuant to successive, one-year policies. Continental, St. Paul Fire and Marine Insurance Company, and Chicago Insurance Company issued umbrella or excess professional liability policies over Empire's coverage. In April 1979, the carriers, without waiver of their respective rights concerning their coverage positions, satisfied in full the judgment in favor of Gary Peter Peek.

Lockwood purchased primary insurance policies from Empire on an annual basis through 1977. Initially, the policy provided coverage for Gerald Lockwood, M.D., in the amount of $100,000 for each claim and $300,000 aggregate coverage (100/300). Effective April 21, 1970, by endorsement, the limits under this policy were increased to $500,000 for each claim and $500,000 aggregate coverage (500/500). The limits were raised at this time in order to comply with Continental's umbrella insurance policy requirement that underlying primary medical malpractice coverage of 500/500 be maintained for its $1,000,000 umbrella policy.

Continental's policy commenced April 21, 1970, and expired April 21, 1973. Lockwood specifically ordered the professional liability policy, not the basic policy, from Continental. However, the professional liability supplement ordered was not delivered to Lockwood. Lockwood was billed for the premium for professional liability coverage.

During the term of Continental's policy, on December 1, 1971, Empire notified Lockwood that it could no longer offer the 500/500 coverage and Empire's coverage was reduced to 100/300. On December 1, 1971, Lockwood purchased a new policy from Empire which added his professional corporation, Lockwood, M.D., P.C., as a named insured, but which also provided only 100/300 policy limits. Thus, halfway through the term of Continental's umbrella policy, Lockwood had only 100/300 policy

limits although Continental required 500/500 primary insurance coverage.

Lockwood elected not to renew Continental's policy because of its requirement of 500/500 underlying limits, and instead obtained a $1,000,000 umbrella policy from St. Paul which required primary coverage of the 100/300 type only, as provided by Empire. St. Paul's policy commenced April 21, 1973, and expired April 21, 1974. When St. Paul's policy expired, it was replaced with a similar $1,000,000 umbrella policy issued by Chicago which was in effect until April 21, 1977.

Continental filed this action on May 26, 1978, to determine the respective rights and responsibilities of the insurance carriers, Lockwood, Lockwood, P.C., and Shelly and Randy Peek, individually, and as next friends of Gary Peter Peek. Lockwood filed counterclaims and cross-claims against the insurance companies, and a third-party complaint against his insurance agent. All parties, with the exception of the insurance companies, settled prior to trial.

In January 1980, the trial court granted summary judgment in favor of St. Paul. The trial was bifurcated; phase one concerned the issues of medical negligence and causation, and phase two addressed the question whether Continental had waived or was estopped from asserting that Lockwood's failure to maintain the underlying limits required by its policy suspended its professional liability coverage.

At the conclusion of the medical phase of the trial, the jury determined that Lockwood had performed four separate acts of negligence which were proximate causes of the injury sustained by Gary Peter Peek. These acts of negligence were: (1) the mistyping of Shelly Peek's blood in July 1972; (2) the failure to retype her blood in March 1974 during her second pregnancy; (3) the failure to investigate adequately the cause of death of the stillbirth of her second child in October 1974; and (4) Lockwood's affirmative advice to the Peeks, following the stillbirth, that they could have further normal children. The jury also determined

that Shelly Peek was sensitized following the delivery of her first child in December 1972.

In phase two of the trial, the jury concluded that Continental was not estopped from asserting the suspension provision of its policy, but that it had waived its right to rely on this provision.

After finding that the jury verdicts were supported by substantial evidence, the court concluded that Empire owed $400,000 in coverage limits, $100,000 for each named insured, Lockwood and Lockwood, P.C., pursuant to the two policies which were in force during that period in which the jury had found negligent acts to have occurred. The trial court also found that Continental and Chicago were obligated to share equally in the remaining unsatisfied portion of the judgment, $175,000, or $87,500 each. The court determined that Empire was responsible for prejudgment interest but that post-judgment interest was to be shared pro rata by the carriers in accordance with their respective coverage responsibilities.

## I.

### Continental's Coverage

Continental contends that the trial court erred in finding that its undelivered professional liability supplement formed a part of its policy covering Lockwood. Continental also asserts that the jury should not have been allowed to consider whether it waived the threshold limit of its policy, arguing that the doctrine of waiver may not be used to expand insurance coverage.

### A.

### Professional Liability Coverage

Continental argues that its coverage of Lockwood should be determined under its basic policy rather than the professional liability policy, since Lockwood did not receive a copy of the professional liability supplement. We disagree.

 Insurance contracts are to be interpreted according to the intent of the parties. *Marez v. Dairyland Insurance*

*Co.,* 638 P.2d 286 (Colo.1981). Actual delivery of an insurance policy to the insured is not a prerequisite to an effective insurance contract. *Chevron Oil Co. v. Industrial Commission,* 169 Colo. 336, 456 P.2d 735 (1969).

■ Lockwood's insurance broker specifically ordered the professional liability insurance from Continental. Continental acknowledges that it intended to issue the professional liability policy to Lockwood. A Continental underwriter, after inspecting the policy, testified that it was apparent that Lockwood had been billed for the premium for professional liability coverage. Since Continental issued only one type of professional liability policy at that time, the precise coverage of the policy in question could easily be determined. Under these circumstances, the trial court correctly found that Continental's coverage was under the professional liability supplement.

## B.

### *Waiver*

Continental next argues that the trial court erred, as a matter of law, in allowing the issue of waiver to be considered by the jury, as the doctrine of waiver may not be used to establish or expand insurance coverage where none existed under the policy. We agree.

The trial court submitted to the jury the issue whether Continental had waived the policy provision which suspended excess coverage if the insured failed to maintain the specified underlying primary policy. The advisory jury found that Continental had waived this provision and the court so held. The trial court ruled that Continental and Chicago were jointly and severally liable for the $175,000 unsatisfied portion of the judgment after deducting Empire's contribution, assigning liability of $87,500 to each excess carrier.

■ The coverage provisions of the Continental policy state:

"(a) [T]he Company shall only be liable for the ultimate net loss in excess of either,

"(1) the amount recoverable under underlying insurance as set out in the attached schedule...."

The specified underlying limits for the professional liability policy were $500,000.

The Continental policy also specified:

"The policy or policies referred to in the attached 'Schedule of Underlying Insurances', and renewal or replacements thereof not more restrictive, shall be maintained by the Named Insured without alteration of terms or conditions in full effect during the currency of this policy except for any reduction of the aggregate limit or limits contained therein solely by payment of claims in respect of occurrences happening during the currency of this policy.

"Except with respect to any claim for professional liability, failure of the Named Insured to comply with the foregoing shall not invalidate this policy but, in the event of such failure, the Company shall only be liable to the same extent had the Named Insured complied to this condition. If the insured fails to maintain the underlying policy of professional liability insurance set out in the schedule, the insurance provided for professional liability by this endorsement shall be suspended and not apply during such period the underlying professional liability policy is not in full force and effect."

Thus, Continental's policy, by its terms, provides coverage only for sums in excess of $500,000 and specifically excludes any coverage under that amount. The import of these policy provisions is that the insured may not expand Continental's exposure by replacing the original primary policy with another policy having a narrower scope of coverage.

■ The doctrine of waiver cannot be invoked to create primary liability and to bring within the coverage of the policy risks not included or contemplated by its terms. *Hartford Live Stock Insurance Co. v. Phillips,* 150 Colo. 349, 372 P.2d 740 (1962). An insured may not expand the scope of an excess insurance policy by re-

placing the original primary policy with a second policy containing a narrower scope of coverage. *Reserve Insurance Co. v. Pisciotta,* 30 Cal.3d 800, 180 Cal.Rptr. 628, 640 P.2d 764 (1982).

 Halfway through the term of Continental's excess policy, Empire, after notifying Lockwood's broker, reduced its underlying coverage to 100/300. It was after the lowering of Empire's coverage that Lockwood's first negligent acts occurred. By procuring a different policy with a lower limit, Lockwood breached the requirement of the Continental policy. This breach created a gap in coverage between the primary and excess policies. Thus, Continental is responsible only for any liabilities of Lockwood which exceed the threshold limit of $500,000.

The trial court's order that Empire pay $400,000 represents its coverage under two separate policies for two separate time periods. Continental was the excess insurance carrier only during the first policy period. Therefore, Empire's liability for $200,000 during the first policy period only, plus that portion of the judgment over $400,000, namely, $175,000, totals $375,000, and is $125,000 under Continental's threshold liability limit. To impose liability on Continental for payment of damages below the threshold limit would be creating insurance coverage where none existed under the policy. The trial court, therefore, erred in requiring Continental to pay one-half of the $175,000 over Empire's payment of $400,000.

## II.

### *Continental's Remaining Issues*

██ Since we have concluded that Continental's excess coverage policy was not activated under these circumstances, it follows that the trial court erred in assessing a pro rata share of post-judgment interest against Continental. Accordingly, the trial court must determine on remand the proper distribution of post-judgment interest excluding Continental as one of the responsible parties therefor.

Similarly, it is not necessary to consider Continental's argument that St. Paul was improperly dismissed from the case. The question of proration of damages between the companies providing excess coverage is academic, since we have determined that Continental cannot be held liable and Chicago, having failed to perfect its cross-appeal, is without standing to argue the issue.

To the extent that it is necessary to reach Continental's other issues in its appeal, they are without merit.

## III.

### *Empire's Coverage*

Empire asserts that the trial court erred in finding that two separate Empire policies were activated by Lockwood's acts of negligence since by doing so the court was in fact recognizing a cause of action for wrongful life. Empire also asserts that the trial court erred in refusing to exhaust Lockwood's primary and excess insurance before reaching the primary insurance of Lockwood, M.D., P.C., and in binding the professional corporation to the judgment against Lockwood, M.D., pursuant to C.R. C.P. 106(a)(5).

### A.

### *Wrongful Life*

Empire first asserts that the trial court erred in finding that separate Empire policies were activated by Lockwood's acts and negligence. Empire contends that only Lockwood's first act of negligence, that of failing correctly to type and record Shelly Peek's blood, is legally significant. It argues that since her sensitization was irreversible, the subsequent acts of negligence were irrelevant. Empire argues that allowing an award of damages for subsequent acts of negligence is to allow recovery for wrongful life and asks that we reject a theory of recovery based on wrongful life. We agree with Empire's analysis, but we decline under these circumstances to preclude recovery.

The jury found that Lockwood committed four separate acts of negligence. Those acts of negligence occurred during two separate insurance policy periods issued by Empire to Lockwood and Lockwood, P.C. The jury found that each of Lockwood's acts of negligence was a proximate cause of Gary Peter Peek's injuries.

Empire argues that, although the jury found Lockwood's acts, subsequent to the original mistyping of Shelly Peek's blood, to have been both negligent and a proximate cause of Peter's injuries, these subsequent negligent acts must be disregarded because the only thing Lockwood could have done differently would have been to advise Shelly Peek of her sensitization and the substantial probability of erythroblastosis fatalis in her future children. This advice would have given her the choice of risking the birth of children likely to be seriously defective or not bearing children at all. Thus, Empire urges that Peter's only option was to be born with the associated defect or not to be born at all. It follows, according to Empire, that the claim based on the subsequent acts of negligence is one for wrongful life, and with this, we agree. It does not necessarily follow, however, that such a claim for relief is unavailable, and we hold that, under the circumstances here, the claim is permissible.

At the outset, wrongful life must be distinguished from other birth-related claims with which it is often confused, namely "wrongful pregnancy," and "wrongful birth." Wrongful pregnancy refers to those cases where parents of a healthy child bring a claim on their own behalf for the monetary and emotional damages they suffered as a result of giving birth to an unwanted child. Wrongful birth claims are brought by parents who claim that they would have avoided conception or terminated the pregnancy had they been properly advised of the risks of birth defects to the potential child. These parents seek recovery for their expenses in caring for the deformed child, and for their own pain and suffering. Wrongful pregnancy actions typically involve a healthy, but unwanted child, whereas wrongful birth actions usually involve planned children who are born deformed. Both actions, however, are brought by the parents on their own behalf. Comment, " 'Wrongful Life': The Right Not To Be Born," 54 Tul.L.Rev. 480 (1980).

Wrongful life actions, on the other hand, are suits brought by the impaired child. The child alleges that but for the defendant doctor or health care providers' negligent advice to, or treatment of, the parents, the child would not have been born. Comment, " 'Wrongful Life': The Right Not To Be Born," supra. The essence of the child's claim is that the defendants wrongfully deprived the parents of information which would have prevented the child's birth. Azzolino v. Dingfelder, 71 N.C.App. 289, 322 S.E.2d 567 (1984). In a wrongful life claim,

"The child does not allege that the physician's negligence caused the child's deformity. Rather, the claim is that the physician's negligence—his failure to adequately inform the parents of the risk— has caused the birth of the deformed child. The child argues that but for the inadequate advice, it would not have been born to experience the pain and suffering attributable to the deformity." Comment, " 'Wrongful Life': The Right Not To Be Born," supra.

In a wrongful life action, as in any negligence action, the defendant must owe the plaintiff a legal duty, the defendant must breach that duty, and the breach must be a proximate cause of the plaintiff's harm. W. Prosser, Torts § 30 (4th ed. 1971). In wrongful life, the theory is that the physician had a duty adequately to inform the parents, who are acting on behalf of the unborn child, of the probability that the child would be born impaired and that, had the parents been so informed, they would have avoided conception. Comment, " 'Wrongful Life': The Right Not To Be Born," supra.

Duty in a wrongful life case is based upon the doctrine of informed con-

sent, which imposes upon the physician a duty to disclose all the facts, including risks and alternatives, that are necessary for the patient to give an intelligent consent to the proposed treatment. Thus, if a physician knows, or should know, facts that indicate an increased likelihood of a deformity in a child, the physician must disclose that information to the parents to permit them to choose intelligently whether to conceive a child. Comment, *"Wrongful Life': The Right Not To Be Born,"* supra.

According to the Restatement (Second) of Torts § 311, the duty owed to the parents inures derivatively to the child. That Restatement section states: "One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results ... to such third persons as the actor should expect to be put in peril by the action taken." A physician should foresee that failure to inform the parents of possible deformities may result in the decision to have a child. Likewise, it is foreseeable that the child will be born deformed. Although the duty to inform is owed to the parents, it is the child who suffers the consequences of the breach. Comment, *"Wrongful Life': The Right Not To Be Born,"* supra. Here, Lockwood's confession of negligence at the *Peek v. Lockwood* trial established Lockwood's duty to Gary Peter Peek.

The relevant causal relationship in wrongful life cases is between the defendant's negligence and the subsequent birth of the child, not between the defendant's negligence and the genetic impairment of the child. *Azzolino, supra.* Having established the duty to inform the parents of the potential deformity, the child-plaintiff must then show that the physician did in fact fail to inform the parents adequately. To complete the chain of causation, there must be evidence to show that, had the parents been so informed, they would have prevented the birth of the child. Comment, *"Wrongful Life': The Right Not To Be Born,"* supra. Here, causation

was not an issue in the *Peek* case, since it was uncontroverted that Lockwood's negligence resulted in Gary Peter Peek's birth.

The final element of a negligence action, damages, has been the most troublesome element in the analysis of a wrongful life claim and has been the basis for denying the claim for relief. The majority of courts which have rejected wrongful life claims have concluded either that the child had not sustained a legally cognizable injury or that appropriate damages were impossible to ascertain. *Azzolino, supra.* The quantum of damages is said to be impossible to compute because the trier of fact would be required to measure the difference in value between life in an impaired condition and the "'utter void of non-existence.'" *Berman v. Allan,* 80 N.J. 421, 404 A.2d 8 (1979), *overruled in Procanik v. Cillo,* 97 N.J. 339, 478 A.2d 755 (1984).

Underlying the conclusion that damages in a wrongful life action are unascertainable is the concept that acknowledgment of wrongful life is a "disavowal of the sanctity of a less-than-perfect human life." *Harbeson v. Parke-Davis, Inc.,* 98 Wash.2d 460, 656 P.2d 483 (1983). The theory is that considerations of public policy dictate a conclusion that life, even with the most severe of impairments, is, as a matter of law, always preferable to non-life. *Turpin v. Sortini,* 31 Cal.3d 220, 182 Cal.Rptr. 337, 643 P.2d 954 (1982). Thus, it has been argued that, even though the impaired child may experience a great deal of physical and emotional pain and suffering, the child will still be able "to love and be loved and to experience happiness and pleasure— emotions which are truly the essence of life and which are far more valuable than the suffering...." *Berman, supra.* Therefore, the argument proceeds, damages cannot flow from an existence having value.

Although this may be arguably true in some cases, we are unwilling to say as a matter of law that life, even with the most severe and debilitating of impairments, is always preferable to non-existence. Because the courts are loathe to deprive a child of all recovery under such

circumstances, a trend has emerged in recent years which allows an impaired child to maintain an action for wrongful life and to recover as special damages only the extraordinary expenses to be incurred during the child's lifetime as a result of the impairment. *See Turpin, supra; Harbeson, supra; Procanik, supra.* However, since damages recoverable on the theory of wrongful life are not an issue in the case before us, it is not necessary that we decide whether a limited damages rule is applicable. We rule only that an action for wrongful life is a proper claim for relief and that, in the circumstances presented, the elements necessary to sustain a recovery for the tort of wrongful life were established.

## B.

### *Professional Corporation Coverage*

Empire next asserts that the insurance of the Lockwood professional corporation should not be activated based upon the right of the employer's insurer to be subrogated to the employer's right of indemnification against its negligent employee. Empire asserts that the professional corporation has a right of indemnification against Lockwood, and therefore, Lockwood's insurance coverage must first be exhausted before any of the coverage available to the professional corporation can be reached. We disagree.

■ An insurer cannot subrogate against its own insured to assert the indemnification claim of its named insured. *Transport Indemnity Co. v. Carolina Casualty Co.*, 133 Ariz. 395, 652 P.2d 134 (1982). This is so because, by definition, subrogation exists only with respect to rights of the insurer against third persons to whom the insurer owes no duty. *Home Insurance Co. v. Pinski Brothers, Inc.*, 160 Mont. 219, 500 P.2d 945 (1972). An insurance company has no subrogation

rights against the negligence of its own insured. *Chenoweth Motor Co. v. Cotton*, 2 Ohio Misc. 123, 207 N.E.2d 412 (1965). To allow subrogation under such circumstances would permit an insurer, in effect, to pass the incidents of the loss, either partially or totally, from itself to its own insured, and thus avoid the coverage which its insured purchased. *Pinski Brothers, supra.*

■ Empire added the P.C. as a named insured on its policy at the request of Lockwood. Each policy provided coverage of $100,000 per occurrence per insured. Two Empire policies were activated which insured Lockwood, individually, and the P.C., with a limit of liability of $100,000 per occurrence per insured. As the insurer of both Lockwood and his professional corporation, Empire cannot assert the professional corporation's indemnification claim against Lockwood. Thus, the trial court properly found that Empire was responsible for a total of $400,000 in primary insurance coverage.

■ Empire next asserts that the trial court erred in entering judgment against Lockwood, P.C., pursuant to C.R.C.P. 106(a)(5). Empire did not raise this issue in the trial court; hence, the argument is not properly before us.

Empire's other contentions of error are without merit.

We affirm the judgment against Empire for $400,000, and reverse the judgment against Continental. The cause is remanded to the trial court with directions to vacate the judgment against Continental, to dismiss Continental from the action, to enter judgment against Chicago in the amount of $175,000, and to determine the proper distribution of post-judgment interest between Empire and Chicago.

BERMAN and VAN CISE, JJ., concur.

APPENDIX 1