PROFFITT v BARTOLO

Docket No. 84840. Submitted December 3, 1986, at Detroit. Decided
August 3, 1987. Leave to appeal applied for.

David L. Proffitt, individually and as next friend of Maya S.
Proffitt, and Yasmin S. Proffitt, brought an action against
Anthony H. Bartolo and Anthony H. Bartolo, M.D., P.C., in the
Monroe Circuit Court, alleging wrongful birth, wrongful life
and breach of contract. The court, James J. Kelley, Jr., J.,
granted summary judgment in favor of defendants. Plaintiffs
appealed.

The Court of Appeals *held:*

1. The court erred in granting summary judgment on plain-
tiffs' wrongful birth claim. The term "wrongful birth" is a
name given to actions brought by the parents of a child born
with severe defects against a physician or other responsible
party who negligently fails to inform them in a timely fashion
of the risk that the mother will give birth to such a child,
effectively precluding an informed decision as to whether the
pregnancy should be avoided or terminated, and is a viable
cause of action in Michigan.

2. The court did not err in granting summary judgment on
plaintiffs' wrongful life claim. A "wrongful life" claim is an
action brought on behalf of a child with birth defects who
claims that, but for the negligent advice to the parents, the
child would not have been born. Michigan does not recognize
such a cause of action.

3. Plaintiffs abandoned the issue of the dismissal of the
breach of contract action.

Affirmed in part, reversed in part and remanded.

REFERENCES

Am Jur 2d, Physicians and Surgeons § 283

Am Jur 2d, Pleading §§ 231-235

Am Jur 2d, Prenatal Injuries § 10

Am Jur 2d, New Topic Service, Right to Die; Wrongful Life §§ 63 *et
seq.*

Am Jur 2d, Torts § 7.

Tort liability for wrongfully causing one to be born. 83 ALR3d 15.

Malpractice: physician's duty to inform patient of nature and
hazards of treatment in pregnancy and childbirth cases under the
doctrine of informed consent. 69 ALR3d 1250.

1. PRETRIAL PROCEDURE — SUMMARY JUDGMENT.

A motion for summary judgment for failure to state a claim upon which relief can be granted seeks to test the genuineness of a claim by challenging the legal adequacy of the pleadings; the standard to be applied in considering such motions is whether the plaintiff's claim, on the pleadings, is so clearly unenforceable as a matter of law that no factual development can possibly justify a right of recovery (GCR 1963, 117.2[1]).

2. WORDS AND PHRASES — WRONGFUL BIRTH — TORTS — DAMAGES.

The term "wrongful birth" is a name given to actions brought by the parents of a child born with severe defects against a physician or other responsible party who negligently fails to inform them in a timely fashion of the risk that the mother will give birth to such a child, effectively precluding an informed decision as to whether the pregnancy should be avoided or terminated, and is a viable cause of action in Michigan; elements of damages include extraordinary medical expenses, the extraordinary costs of raising the child and the emotional harm they have suffered.

3. WORDS AND PHRASES — WRONGFUL LIFE.

A "wrongful life" claim is an action brought on behalf of a child with birth defects who claims that, but for the negligent advice to the parents, the child would not have been born; there is no wrongful life cause of action in Michigan.

4. PHYSICIANS AND SURGEONS — ABORTION — TORTS — DUTY.

As long as abortion remains an option allowed by law, the physician owes a duty to furnish patients with adequate information for them to be able to decide whether to choose that course of action.

*Michael L. Pitt,* for plaintiffs.

*Weipert, Morr & Weipert* (by *James E. Morr*), for defendants.

Before: DANHOF, C.J., and SHEPHERD and W. A. PORTER,* JJ.

SHEPHERD, J. Plaintiffs appeal from a grant of summary judgment in favor of defendants in this

---

* Circuit judge, sitting on the Court of Appeals by assignment.

medical malpractice action. This case requires us to consider again the liability of a physician for both "wrongful birth" and "wrongful life." Specifically, we are concerned here with whether a physician is liable to both the parents and a child when the latter suffers from birth defects caused by the failure to diagnose an illness in the mother in the first trimester of pregnancy—thereby depriving the parents of the option of aborting the unborn child. We reverse in part and remand for further proceedings. We are allowing the parents' "wrongful birth" claim because it has existed in Michigan since 1981 and has not been abolished by legislation or by the Supreme Court. We will not create a claim on the part of the child for "wrongful life" since we believe that this issue is more appropriately addressed by the Legislature or the Supreme Court.

I

Plaintiffs David and Yasmin Proffitt filed this suit on February 8, 1978. They alleged that, approximately two weeks before February 11, 1976, Yasmin displayed many of the clinical manifestations of rubella (German measles), including a rash. On February 11, 1976, during the first trimester of pregnancy, plaintiffs retained defendant Dr. Bartolo to provide professional services relating to Yasmin's pregnancy and delivery. They reported the rash's history to Dr. Bartolo and his nurse.

Dr. Bartolo sent Yasmin to Mercy-Memorial Hospital in Monroe, Michigan, for studies. On February 26, 1976, the blood studies were performed, including a test for rubella. During March, 1976, Yasmin continued under Dr. Bartolo's care and complained of chronic headaches, fever, ma-

laise, and gastrointestinal discomfort. On March 17, 1976, Dr. Bartolo again admitted Yasmin to the hospital for the treatment of a parasitic infection associated with hematemesis and headaches. Dr. Bartolo diagnosed Yasmin's condition as a whipworm infestation and discharged her from the hospital on March 19, 1976. In the following months, Yasmin continued to complain of chronic headaches, nausea, malaise, and fever to Dr. Bartolo.

David called Dr. Bartolo on June 14, 1976, to complain about Yasmin's high fever. At the end of the conversation, Dr. Bartolo advised plaintiffs that he could no longer provide professional services to them and that they should seek the services of another physician. Plaintiffs retained the services of another physician who delivered the child, plaintiff Maya S. Proffitt, on August 23, 1976.

Plaintiffs alleged numerous instances of negligent conduct on Dr. Bartolo's part. Essentially, plaintiffs alleged that Dr. Bartolo failed to exercise the required degree of care and skill in diagnosing and treating Yasmin, including a failure to take an adequate history, to employ sufficient diagnostic tests, to interpret the rubella test properly, and to order additional tests to evaluate the risk of a rubella or other infection which could cause congenital fetal malformations. Plaintiffs allege that Dr. Bartolo failed to advise them of the rubella test results, the significance of those findings and the necessity of further tests, and the risk of severe congenital fetal malformations resulting from rubella or other serious infections during Yasmin's first trimester of pregnancy. Plaintiffs also alleged that Dr. Bartolo failed to advise plaintiffs of the risks to the fetus so that plaintiffs could decide whether to terminate the pregnancy. Plain-

tiffs allege that, had Dr. Bartolo properly diagnosed Yasmin's condition and adequately advised them, they would have terminated Yasmin's pregnancy. Instead, Maya was born with microcephaly, mental retardation, severe bilateral eye malformations resulting in blindness, and other severe congenital malformations caused by a rubella infection or another intrauterine viral, parasitic or protozoic infection transmitted to Maya during the early stages of fetal development.

In Count I, David and Yasmin sought recovery for the "substantial medical, institutional and educational" expenses they will incur until Maya reaches age eighteen. They also sought damages for "emotional strain and distress, pain and suffering and the loss of services, society, companionship, comfort and support" from Maya. Count II was brought on Maya's behalf, alleging that she will be unable to earn any income and seeking recovery for the "extensive medical, institutional and educational" expenses she will incur after reaching age eighteen. Maya also requested damages for the "severe pain and suffering, emotional distress and pain, embarrassment and humiliation" resulting from her grave congenital deformities. Count III alleged a breach of contract claim against defendants.

A series of delays not important to the legal issues raised in this appeal followed. After discovery, however, defendants moved on February 20, 1985, for summary judgment under GCR 1963, 117.2(1), now MCR 2.116(C)(8), for failure to state a claim upon which relief can be granted. Defendants argued that Michigan does not recognize a claim for "wrongful life" and, thus, both the parents' and child's claims should be dismissed. Following a hearing, the circuit court entered an

order on April 19, 1985, dismissing all of plaintiffs' claims.

II

A motion for summary judgment under GCR 1963, 117.2(1) tests the legal adequacy of the pleadings. A court must accept all well-pleaded facts as true. The test is whether plaintiffs' claim, on the pleadings, is so clearly unenforceable as a matter of law that no factual development could justify a right to recovery. *Abel v Eli Lilly & Co,* 418 Mich 311, 323-324; 343 NW2d 164 (1984). Thus, we must determine whether plaintiffs' complaint adequately alleges recognized claims for "wrongful birth" and "wrongful life."[1]

The term "wrongful birth" is a shorthand name given to actions brought by the parents of a child born with severe defects against a physician (or other responsible party) who negligently fails to inform them in a timely fashion of the risk that the mother will give birth to such a child, effectively precluding an informed decision as to whether the pregnancy should be avoided or terminated. A "wrongful life" claim, on the other hand, is brought on behalf of a child with birth defects who claims that, but for the negligent advice to

[1] At oral argument, defendants' attorney suggested that discovery had revealed no evidence that Yasmin had rubella or any other disease which could produce Maya's birth defects and that the trial court's grant of summary judgment was probably based at least in part on this. Such a claim should have been brought under GCR 1963, 117.2(3), now MCR 2.116(C)(10), however. The record clearly reveals that defendants brought and the court decided the motion under the subrule concerning failure to state a claim, and we are limited to reviewing the order under that subrule. A review of the record, including plaintiffs' answers to interrogatories, suggests that plaintiffs may have difficulty in proving that Maya's birth defects resulted from rubella. While further proceedings in this case may ultimately include consideration of a properly filed motion under MCR 2.116(C)(10), see *Kircos v Holiday Food Center, Inc,* 424 Mich 487, 493; 381 NW2d 404 (1986), we do not consider such a motion now.

the parents, the child would not have been born.[2] See *Smith v Cote,* 128 NH 231; 513 A2d 341, 344 (1986); *Procanik v Cillo,* 97 NJ 339, 347-348; 478 A2d 755 (1984). Both causes of action involve claims of professional negligence. *Dorlin v Providence Hospital,* 118 Mich App 831, 836; 325 NW2d 600 (1982). This Court has previously considered both causes of action.

### III

This Court first addressed these causes of action in *Eisbrenner v Stanley,* 106 Mich App 357; 308 NW2d 209 (1981), lv den 414 Mich 875 (1982), a case involving rubella-caused birth defects. The Court recognized a claim for wrongful birth. The Court in *Eisbrenner* began its analysis with the seminal New Jersey case of *Gleitman v Cosgrove,* 49 NJ 22; 227 A2d 689 (1967), in which the New Jersey Supreme Court rejected both causes of action. With regard to wrongful birth, the New Jersey Supreme Court found it impossible to measure damages by weighing the "complex human benefits" of parenthood against the alleged emotional and pecuniary damages. The court was also troubled by a cause of action which appeared contrary to the public policy favoring the preciousness of human life.

*Eisbrenner* noted that the New Jersey Supreme Court had retreated from its earlier position on wrongful birth in *Berman v Allan,* 80 NJ 421; 404 A2d 8 (1979). This retreat was premised at least in part on the fact that the parents' decision whether or not to terminate a pregnancy during the first

---

[2] A third type of claim, "wrongful pregnancy" involving negligent sterilization or contraception, is not relevant to this case. Both causes of action which we consider must also be distinguished from the situation where negligent injury to a normal fetus results in the birth of a child with birth defects.

trimester must be free of governmental interference following *Roe v Wade,* 410 US 113; 93 S Ct 705; 35 L Ed 2d 147 (1973). *Eisbrenner* cited other cases approving the parents' cause of action but not the child's. In particular, the Court noted *Jacobs v Theimer,* 519 SW2d 846 (Tex, 1975), in which the Texas court found it impossible to justify a policy which deprived the parents of information by which they could elect to terminate the pregnancy likely to produce a defective child, required that the pregnancy be continued until a deficient child was born, and then denied recovery from the tortfeasor of the cost of treating and caring for the child's defects. *Eisbrenner* allowed the plaintiff parents to seek medical expenses and damages for mental distress, under the rules outlined in *Troppi v Scarf,* 31 Mich App 240; 187 NW2d 511 (1971).

This Court has not again directly faced the wrongful birth issue until now. *Eisbrenner* and the wrongful birth cause of action were mentioned in *Dorlin, supra,* p 835, and *Strohmaier v Associates in Obstetrics & Gynecology,* 122 Mich App 116, 119; 332 NW2d 432 (1982), lv den 417 Mich 1072 (1983). Both of those cases primarily concerned the wrongful life issue, however.

The jurisdictions considering the issue have now almost uniformly adopted the wrongful birth cause of action. See generally *James G v Caserta,* 332 SE2d 872, 875, n 6 (W Va, 1985),[3] and Anno: *Tort liability for wrongfully causing one to be born,* 83 ALR3d 15. Those courts have offered a variety of reasons for doing so.

The Illinois appellate court concluded that "life and family will be more likely preserved if negligent defendants are required to contribute to such

[3] Some of the cases cited, however, concern wrongful pregnancy or conception rather than wrongful birth.

extraordinary out-of-pocket expenses as a fact-finder may attribute to their conduct." *Siemieniec v Lutheran General Hospital,* 134 Ill App 3d 823, 829-830; 89 Ill Dec 484; 480 NE2d 1227 (1985). It appears, however, that Illinois does not permit recovery of emotional distress damages, save in extreme circumstances. 134 Ill App 3d 831. A similar limitation on damages occurred in *Becker v Schwartz,* 46 NY2d 401, 414; 413 NYS2d 895; 386 NE2d 807 (1978), with the New York court seeking to avoid "the drawing of artificial and arbitrary boundaries" in a situation inevitably filled with mixed emotions.

The reasons for the decline of the *Gleitman* view of wrongful birth are well summarized in the recent New Hampshire case of *Smith, supra,* 513 A2d 344-346. First, health care professionals have an increased ability to predict and detect severe or fatal birth defects. Second, as also recognized by our Court in *Eisbrenner, Roe v Wade* prohibits during the first trimester regulatory interference with a woman's decision to terminate her pregnancy or to carry the child to term:

> When *Gleitman* was decided, the science of pre-natal testing and risk assessment was nascent, and in many states abortions could not legally be obtained. Today, as a result of *Roe* and the advances of science, it is possible for prospective parents (1) to know, well in advance of birth, of the risk or presence of congenital defects in the fetus they have conceived; and (2) to decide to terminate the pregnancy on the basis of this knowledge. Courts accordingly have recognized that physicians who perform testing and provide advice relevant to the constitutionally guaranteed procreative choice, or whose actions could reasonably be said to give rise to a duty to provide such testing or advice, have an obligation to adhere to

reasonable standards of professional performance.
[513 A2d 346.]

The New Hampshire Supreme Court concluded that the wrongful birth action contained the traditional elements of negligence. Given a physician-patient relationship with respect to the pregnancy, a physician assumes a duty to use reasonable care in attending and treating the patient. That duty requires the physician to ensure that the woman has an opportunity to make informed decisions regarding the procreative options available to her. The appropriate standard of care may require testing for and disclosure of exposure to rubella, for example, depending on the factual circumstances. Failure to fulfill these obligations would be a breach of the duty. If a plaintiff can show that but for the defendant's negligent failure to inform her of the risks of bearing a child with birth defects she would have obtained an abortion, the causation element is satisfied. Finally, injury may result from the imposition on the parents of extraordinary liabilities, both emotional and pecuniary, following the birth of the child. The difficulty of assessing the damages for such injuries is not a sufficient reason to deny recovery. 513 A2d 346-348.

A similar detailed analysis was done by the Washington Supreme Court in *Harbeson v Parke-Davis, Inc,* 98 Wash 2d 460, 467-478; 656 P2d 483 (1983). *Harbeson* emphasized that the "difficult moral choice" to abort or avoid conception belonged to the parents, who had a right to prevent the birth of a defective child, giving rise to a correlative duty on the part of health care providers to supply material information. This duty in no way affected the right of a physician to refuse to perform an abortion on moral or religious

grounds.[4] 98 Wash 2d 472-473. *Harbeson* also suggests that the theory of informed consent may be implicated in a proper case, as the proximate cause of the injury results from the failure to inform. 98 Wash 2d 477-478. With regard to damages, *Harbeson* held that the parents could recover for the medical expenses attributable to the child's defective condition and for emotional injury caused by the birth of the defective child, though the jury could also consider countervailing emotional benefits attributable to the birth of the child. 98 Wash 2d 475.

The *Smith* court noted that its holding neither encouraged nor discouraged the practice of abortion, nor did it rest upon a judgment that the child should never have been born. The court instead sought to further the first principles of the law of negligence: deterring negligent conduct and compensating the victims of those who act unreasonably. 513 A2d 348. The court allowed recovery of the extraordinary costs involved in treating and raising the child, as well as loss for emotional distress that results in pecuniary losses such as for medical or counseling fees. 513 A2d 349-350. The court in *Smith* denied recovery for emotional distress. 513 A2d 351.

Of the courts which have recently addressed the wrongful birth issue, it appears that only North Carolina's has refused to recognize such a claim "absent a clear mandate by the legislature." *Azzolino v Dingfelder,* 315 NC 103; 337 SE2d 528, 533 (1985), cert den — US —; 107 S Ct 131; 93 L Ed 2d 75 (1986). The court was troubled by an "untraditional" analysis "holding that the existence of human life can constitute an injury cognizable at law." The North Carolina Supreme Court also

---

[4] See also *Eisbrenner, supra,* p 367.

noted that this conceptual difficulty had produced the widely divergent views on the appropriate measure of damages and mitigation of damages resulting from the love and affection of the defective child. 337 SE2d 534. The court was further concerned that the tort would give rise to fraudulent testimony concerning the parents' desire to abort the fetus or at least a denial of the possibility that they would have changed their minds. The court foresaw difficulties in determining what defects would support the claim, pondering whether the mere fact that the child was of one sex rather than the other would be sufficient to subject the physician to liability. Finally, the court foresaw that pressure on physicians would inevitably lead to their taking the safe course of recommending abortion.

Against this backdrop, we conclude that the *Eisbrenner* holding with regard to wrongful birth remains the law in Michigan until changed by the Legislature or the Supreme Court. The issue of whether abortion should be allowed and all the related moral, religious, and policy arguments are not before us following the line of privacy cases culminating in *Roe v Wade, supra.* The issue is instead whether physicians have a duty to ascertain and advise parents of information necessary for the parents to exercise the options provided by *Roe,* whatever the physician personally believes. If a physician breaches the appropriate duty under the facts of a case, and it can be established that the parents would have avoided or terminated the pregnancy, the necessary causal connection is established. The parents should recover for their extraordinary medical expenses and the extraordinary costs of raising the child, as well as the emotional harm they have suffered.

As long as abortion remains an option allowed

by law, the physician owes a duty to furnish patients with adequate information for them to be able to decide whether to choose that course of action. Those who would eliminate such a right of recovery must first abolish the right to have an abortion—a matter not germane to this appeal. We note that our Supreme Court denied leave to appeal in *Eisbrenner.* We specifically invite the Supreme Court to grant leave now so that the vital issues raised in this case can be put to rest in Michigan.

## IV

The wrongful life cause of action has previously been rejected by this Court on three occasions. While *Eisbrenner* allowed the parents' cause of action, it rejected the child's based on the rationale used by the Court in *Gleitman, supra,* and *Becker, supra.* In a much cited passage, *Gleitman* determined that the child's damages were not legally cognizable:

> The normal measure of damages in tort actions is compensatory. Damages are measured by comparing the condition plaintiff would have been in, had the defendants not been negligent, with plaintiff's impaired condition as a result of the negligence. The infant plaintiff would have us measure the difference between his life with defects against the utter void of nonexistence, but it is impossible to make such a determination. This Court cannot weigh the value of life with impairments against the nonexistence of life itself. By asserting that he should not have been born, the infant plaintiff makes it logically impossible for a court to measure his alleged damages because of the impossibility of making the comparison required by compensatory remedies. [49 NJ 28.]

*Becker* rejected the wrongful life cause of action

after finding two flaws in claims on behalf of the child:

> The first, in a sense the more fundamental, is that it does not appear that the infants suffered any legally cognizable injury. . . . Whether it is better never to have been born at all than to have been born with even gross deficiencies is a mystery more properly to be left to the philosophers and the theologians. Surely the law can assert no competence to resolve the issue, particularly in view of the very nearly uniform high value which the law and mankind has placed on human life, rather than its absence. Not only is there to be found no predicate at common law or in statutory enactment for judicial recognition of the birth of a defective child as an injury to the child; the implications of any such proposition are staggering. Would claims be honored, assuming the breach of an identifiable duty, for less than a perfect birth? And by what standard or by whom would perfection be defined?
>
> There is also a second flaw. The remedy afforded an injured party in negligence is designed to place that party in the position he would have occupied but for the negligence of the defendant. . . . Thus, the damages recoverable on behalf of an infant for wrongful life are limited to that which is necessary to restore the infant to the position he or she would have occupied were it not for the failure of the defendant to render advice to the infant's parents in a nonnegligent manner. The theoretical hurdle to an assertion of damages on behalf of an infant accruing from a defendant's negligence in such a case becomes at once apparent. The very allegations of the complaint state that had the defendant not been negligent, the infant's parents would have chosen not to conceive, or having conceived, to have terminated rather than to have carried the pregnancy to term, thereby depriving the infant plaintiff of his or her very existence. Simply put, a cause of action brought on behalf of an infant seeking recovery for wrongful life de-

mands a calculation of damages dependent upon a comparison between the Hobson's choice of life in an impaired state and nonexistence. This comparison the law is not equipped to make. . . . Recognition of so novel a cause of action requiring, as it must, creation of a hypothetical formula for the measurement of an infant's damages is best reserved for legislative, rather than judicial, attention. [46 NY2d 411-412. Citations omitted.]

*Eisbrenner* declined to follow *Curlender v Bio-Science Laboratories,* 106 Cal App 3d 811; 165 Cal Rptr 477 (1980), a case which recognized the cause of action and allowed the child to seek recovery for costs of medical care, pain and suffering, and punitive damages.[5] *Eisbrenner* refused to allow the jury to speculate on the child's damages given the impossibility of comparing nonexistence and deformed life, stating that, since damage awards could range from zero to millions of dollars on essentially the same evidence, the "courts [would become] forums for pure gambling events" and "[i]t would make as much sense to award damages on a throw of the dice." 106 Mich App 366.

*Eisbrenner* was followed in *Dorlin, supra.* The *Dorlin* Court also rejected the opportunity to consider a limited wrongful life cause of action for special damages for the child's own extraordinary expenses after the age of majority, as the issue had not been briefed on appeal, the Court believing this task to be more appropriate for the Supreme Court or the Legislature. 118 Mich App 835, n 3. *Eisbrenner* was also followed in *Strohmaier, supra,* a case factually very similar to both *Eisbrenner* and the case at bar. *Strohmaier* declined

[5] *Curlender* was overruled by the California Supreme Court after *Eisbrenner* was decided. *Turpin v Sortini,* 31 Cal 3d 220; 182 Cal Rptr 337; 643 P2d 954 (1982). The *Curlender* decision is discussed in greater detail below.

to recognize a limited cause of action for the child's special damages such as that adopted in *Turpin v Sortini,* 31 Cal 3d 220; 182 Cal Rptr 337; 643 P2d 954 (1982), the case which overruled *Curlender.* The *Strohmaier* Court stated:

> The special damages that are claimed cannot be considered in a vacuum separate from the reality that, but for the alleged negligence, plaintiff would not exist. Plaintiff's damages, general and special, consist of the difference between his present life with defects and no life at all. Plaintiff's economic liabilities, like the daily pain and suffering he must endure, are a part and parcel of his life with birth defects. Therefore, this Court cannot view those economic losses apart from the incalculable benefit of life conferred upon plaintiff by the events antecedent to his birth. Consequently, we conclude that plaintiff's special damages are as incognizable as any general damages for pain and suffering. [122 Mich App 122.]

This argument was subsequently adopted by the Texas Supreme Court in its denial of even a limited cause of action for special damages. *Nelson v Krusen,* 678 SW2d 918, 925 (Tex, 1984).

*Eisbrenner* was decided in mid-1981 and *Strohmaier* was decided in late 1982. Since that time, the New Jersey Supreme Court has also retreated from its position in *Gleitman* regarding wrongful life and allowed a wrongful life cause of action for the extraordinary costs of care. *Procanik, supra.* Moreover, a few other jurisdictions have since adopted the wrongful life cause of action. Therefore, we believe a careful reexamination of the wrongful life issue is required.

The majority of jurisdictions considering the question have refused to recognize wrongful life claims. See generally 83 ALR3d 15; *Goldberg v Ruskin,* 113 Ill 2d 482, —; 101 Ill Dec 818; 499

NE2d 406, 407 (1986); *Bruggeman v Schimke,* 239 Kan 245, 249-254; 718 P2d 635 (1986). Again, the courts have offered a variety of reasons for doing so.

*Bruggeman, supra,* 239 Kan 249-251, summarizes some of the main reasons. Many courts have echoed the rationale of *Becker* in refusing to recognize a legally cognizable injury in being born impaired rather than not being born at all. Under this view, the tort is often perceived as contradictory to the belief that life is precious and that life, even with a major handicap, is preferable to nonlife. Moreover, this view recognizes the difficulty of determining to what deformities the tort should apply. Many courts also follow the reasoning of *Gleitman* and *Becker* with regard to the impossibility of measuring damages in terms of weighing the value of a defective life against the value of no life at all.

In addition to its inability to concede that a plaintiff's birth could constitute an injury, the New Hampshire Supreme Court offered three policy reasons militating against recognition of the tort. First, courts should not be involved in deciding if a given person's life is worthwhile or not. The court observed that the evolving "right to die" doctrine avoids such objective judgments as to the value of a plaintiff's life and strives instead to protect the individual's subjective will. A wrongful life claim, however, requires assessing the worth of a child's life. A court "has no business declaring that among the living are people who never should have been born." *Smith, supra,* 513 A2d 353. Second, the Court concluded that legal recognition that a disabled life is an injury would harm the interests of handicapped persons by denigrating society's new awareness that handicapped persons can be valuable or productive members of society.

Third, the Court found that a finding of injury necessarily hinged upon subjective and intensely personal notions as to the intangible value of life, with the manifest danger of markedly disparate and unpredictable outcomes. 513 A2d 353. *Smith* declined to adopt even a limited right of recovery for special damages, reasoning that such a rule would have significant "doctrinal and symbolic implications" and was primarily deficient in imposing liability even if the defendant has caused no harm. To eliminate any resultant unfairness, however, *Smith* allowed the parents to recover the child's post-majority expenses in a wrongful birth action. 513 A2d 354.

The West Virginia Supreme Court of Appeals concluded that the physician's duty to give the parents information so that an informed choice could be made did not extend to the unborn child, as it is the parents' decision to risk conception or to terminate a pregnancy. The court echoed the common theme holding that it should be up to the legislature to create such a cause of action. *James G, supra*, 332 SE2d 881.

The highest courts of three states, however, have embraced wrongful life causes of action permitting the child to recover special damages for the extraordinary costs of education, and medical and other necessary care beyond the age of majority.[6] *Turpin, supra; Procanik, supra; Harbeson, supra*. The intermediate appellate court of Illinois has also embraced this limited cause of action. *Siemieniec, supra*. While leave to appeal has been granted in *Siemieniec*, see *Goldberg, supra*, 499 NE2d 407, that appeal has apparently not yet been

---

[6] At least two jurisdictions have reached a similar result by explicitly allowing the parents to recover post-majority expenses in a wrongful birth action. *Smith, supra*, 513 A2d 354; *James G, supra*, 332 SE2d 881-882 (citing additional cases).

resolved. The Illinois Supreme Court rejected a wrongful life claim for general damages only, offering reasons similar to those offered by the other courts, but left open the *Siemieniec* question of special damages. *Goldberg, supra,* 499 NE2d 407, 410. Finally, the Colorado Court of Appeals concluded that an action for wrongful life is a proper claim for relief. The case before the court concerned a dispute between the physician's malpractice insurers, however. Thus, the court found it unnecessary to decide whether a limited damages rule should apply. *Continental Casualty Co v Empire Casualty Co,* 713 P2d 384, 394 (Colo App, 1985). The Colorado Supreme Court granted certiorari on January 13, 1986, apparently in an unpublished order.

In *Curlender, supra,* the California Court of Appeal disagreed with the decisions of other states holding that a child born with serious birth defects as opposed to not being born at all has suffered no legally cognizable injury:

> The circumstance that the birth and injury have come hand in hand has caused other courts to deal with the problems by barring recovery. The reality of the "wrongful-life" concept is that such a plaintiff both *exists* and *suffers,* due to the negligence of others. It is neither necessary nor just to retreat into meditation on the mysteries of life. We need not be concerned with the fact that had defendants not been negligent, the plaintiff might not have come into existence at all. The certainty of genetic impairment is no longer a mystery. In addition, a reverent appreciation of life compels recognition that plaintiff, however impaired she may be, has come into existence as a living person with certain rights. [106 Cal App 3d 829. Emphasis in original.]

We reject as untenable the claim that plaintiff is

entitled to damages as if plaintiff had been born without defects and would have had a normal life expectancy. Plaintiff's right to damages must be considered on the basis of plaintiff's mental and physical condition at birth and her expected condition during the short life span (four years according to the complaint) anticipated for one with her impaired condition. In similar fashion, we reject the notion that a "wrongful-life" cause of action involves any attempted evaluation of a claimed right *not* to be born. In essence, we construe the "wrongful-life" cause of action by the defective child as the right of such child to recover damages for the pain and suffering to be endured during the limited life span available to such a child and any special pecuniary loss resulting from the impaired condition. [106 Cal App 3d 830-831. Emphasis in original.]

*Turpin, supra,* however, found a basic fallacy in this reasoning, citing the tragic fact that such a child never has the chance "to be born as a whole, functional human being" without defects. The defendant in such cases has not caused the child's injuries and nothing a physician could do would give the child an unimpaired life. Because at best the child would have no life at all, *Turpin* concluded that a court must take this into consideration. 31 Cal 3d 232. Recognizing the difficulty that this comparison of impaired life against nonlife has caused many courts, *Turpin* questioned whether these considerations provide a sound basis for entirely rejecting the cause of action. The court concluded that an award of damages to a severely handicapped or suffering child would not "disavow" the value of life. Moreover, the emerging doctrine permitting terminally ill patients to make decisions regarding further life-sustaining procedures suggested that public policy did not establish, as a matter of law under all circumstances, that an impaired life is preferable to nonlife:

Considering the short life span of many of these children and their frequently very limited ability to perceive or enjoy the benefits of life, we cannot assert with confidence that in every situation there would be a societal consensus that life is preferable to never having been born at all.

While it thus seems doubtful that a child's claim for general damages should properly be denied on the rationale that the value of impaired life, as a matter of law, always exceeds the value of nonlife, we believe that the out-of-state decisions are on sounder grounds in holding that—with respect to the child's claim for pain and suffering or other general damages—recovery should be denied because (1) it is simply impossible to determine in any rational or reasoned fashion whether the plaintiff has in fact suffered an injury in being born impaired rather than not being born, and (2) even if it were possible to overcome the first hurdle, it would be impossible to assess general damages in any fair, nonspeculative manner. [31 Cal 3d 234.]

Cf. *Continental Casualty, supra,* 713 P2d 393-394, reaching a similar conclusion concerning whether impaired life is always preferable to no life. *Turpin* also found it impossible to determine how the benefit of the child's "physical existence with the capacity both to receive and give love and pleasure as well as to experience pain and suffering" should be weighed in mitigating damages. 31 Cal 3d 237.

*Turpin,* however, concluded that it would be "illogical and anomolous" to permit the parents to recover the extraordinary costs of caring for the child yet deny recovery of the same to the child if no duplication results. *Turpin* permitted the child to recover special damages. Such damages are readily measurable and are not offset by any benefit. 31 Cal 3d 237-239.

In *Harbeson, supra,* the Washington Supreme

Court determined that the child may maintain an action for extraordinary expenses to be incurred during the child's lifetime, not to duplicate the parents' recovery, after analyzing the tort under general negligence principles. 98 Wash 2d 480-483. Cf. *Continental Casualty, supra,* 713 P2d 392-394 (physician's derivative duty to child based on informed consent). *Harbeson* concluded that imposing a duty to the child corresponding to that imposed in a wrongful birth claim "will similarly foster the societal objectives of genetic counseling and prenatal testing, and will discourage malpractice." 98 Wash 2d 481.

In *Procanik, supra,* the New Jersey Supreme Court withdrew from its earlier position to allow the child to recover extraordinary medical expenses:

> When a child requires extraordinary medical care, the financial impact is felt not just by the parents, but also by the injured child. As a practical matter, the impact may extend beyond the injured child to his brothers or sisters. Money that is spent for the health care of one child is not available for the clothes, food, or college education or another child.
>
> Recovery of the cost of extraordinary medical expenses by either the parents or the infant, but not both, is consistent with the principle that the doctor's negligence vitally affects the entire family. [99 NJ 351.]

In *Procanik,* the parents' wrongful birth claim was barred by the statute of limitations, but the court concluded that this situation should not cause the child to forego medical treatment for his defects. The court denied general damages, however, because of the "insurmountable problems" faced by other courts in attempting to compare impaired existence with nonexistence:

Such a claim would stir the passions of jurors about the nature and value of life, the fear of non-existence, and about abortion. That mix is more than the judicial system can digest. We believe that the interests of fairness and justice are better served through more predictably measured damages—the cost of the extraordinary medical expenses necessitated by the infant plaintiff's handicaps. Damages so measured are not subject to the same wild swings as a claim for pain and suffering and will carry a sufficient sting to deter future acts of medical malpractice. [97 NJ 354.]

The plaintiff made no claim for general damages in *Siemieniec, supra.* In allowing the recovery of extraordinary out-of-pocket expenditures, the court emphasized that a real rather than a theoretical injury was asserted, defined by the extraordinary expenses rather than the damages for being born impaired as against the value of not being born at all. The child's damages were not for "wrongful life"; instead, the child sought "the same legal rights for redress of otherwise cognizable damage that every person possesses." 134 Ill App 3d 834-835.

We are thus faced with deciding whether we should determine which reasons are more cogent and whether we should accept the wrongful life cause of action in either its limited or more general form.[7] We begin with the proposition that the wrongful birth cause of action already exists as a

---

[7] In addition to the cases discussed above which have wrestled with this thorny problem, a number of commentators have analyzed the issue, particularly the question of damages. See, e.g., Special Project, *Legal Rights and Issues Surrounding Conception, Pregnancy, and Birth,* 39 Vand L Rev 597, 750-770 (1986); Pace, *The Treatment of Injury in Wrongful Life Claims,* 20 Colum J L & Soc Probs 145 (1986); Foutz, *"Wrongful Life": The Right Not to Be Born,* 54 Tul L Rev 480, 492-498 (1980); Capron, *Tort Liability in Genetic Counseling,* 79 Colum L Rev 618, 647-673 (1979); Note, *A Cause of Action for "Wrongful Life": [A Suggested Analysis],* 55 Minn L Rev 58, 62-67, 74-75 (1970).

valid cause of action in this state and elsewhere. It follows, then, that the reasons for accepting it have also been found to be valid. As both the wrongful birth and the wrongful life causes of action generally arise out of the same factual situation, those reasons arguably apply with equal validity and relevancy to the wrongful life cause of action. Nevertheless, this Court has previously refused to allow a wrongful life claim to stand, the Supreme Court has refused to review that point of view, and the Legislature has not seen fit to act in this area. Consequently we are reluctant to resolve all of the moral and public policy arguments that others at a different or higher level have declined to address. There comes a point at which three judges on an intermediate appellate court should restrain themselves from making new law. The decision whether a life with birth defects has a greater or lesser value than no life at all is beyond such a point. Consequently we will allow the law to remain where it stands. The "wrongful birth" claim in this case must go to trial and the "wrongful life" claim will remain dismissed.

Neither the courts, the Legislature nor the public should have any illusions about the long-term financial impact of our decision. By deciding that the physician has no responsibility to the child to pay for his or her extraordinary expenses in an action brought on behalf of the child, we are shifting that responsibility in many cases to the state, which will have to care for the child (and the adult, if the child lives) far into the future in the more aggravated cases where other funds are unavailable. The net economic effect of our holding may be that when the physician fails to give proper information to the parents, all of the people of the state pay the price. If this is not the opti-

mum result, the conflicting economic and moral interests are best resolved in the Legislature.

V

We note that the trial court dismissed all of plaintiffs' claims. No argument was made below and the trial court made no explicit ruling on Count III, plaintiffs' breach of contract claim. Plaintiffs have not raised the issue whether summary judgment was properly granted on this count. We deem the issue abandoned on appeal, and do not address it sua sponte. *McGruder v Michigan Consolidated Gas Co,* 113 Mich App 664, 667; 318 NW2d 531 (1982).

Affirmed in part, reversed in part and remanded for trial on the parents' claim for wrongful birth. We do not decide any issues relating to damages beyond those discussed above since this matter should be resolved in the first instance by the trial court.